Gabrielle TURGEON, et al., Plaintiffs,

v.

HOWARD UNIVERSITY, et al., Defendants.

Civ. A. No. 81–2973.

United States District Court, District of Columbia.

July 13, 1983.

R. Diane Wyatt, Richard J. Hopkins, Washington, D.C., for defendants.

Hamilton & Hamilton, John M. Clifford, Stephen A. Trimble, Washington, D.C., for plaintiffs.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

AUBREY E. ROBINSON, Jr., Chief Judge.

This case came before the Court for a trial upon Plaintiff's claim of employment discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* Plaintiff's claim of employment discrimination under the District of Columbia Human Rights Act, D.C.Code §§ 1–2501, *et seq.*, as well as her claim for damages resulting from a breach of her employment contract were simultaneously tried before a jury which rendered verdicts in Plaintiff's behalf. This Court, based on documentary and testimonial evidence adduced at the five day trial and the inferences reasonably deducible therefrom, enters the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

*Plaintiff's Prima Facie Case of Race Discrimination*

1. Plaintiff, Gabrielle Turgeon, is a white female whose native tongue is French. She holds a Bachelor's degree in French and Spanish from Bethune-Cookman College, a Master's degree in French and Spanish from California State University and a Ph.D degree in French Language and Literature of the 19th Century from Florida State University.

2. Defendant Howard University is a predominantly Black private institution of higher learning established in the District of Columbia by Act of Congress for the education of men and women in the liberal arts and sciences. It is an employer engaged in an industry that affects commerce and employs more than 15 employees.

3. In 1975, Plaintiff was invited to the Defendant Howard University for an interview with Dr. Willis who was then Chairman of the Department of Romance Languages. Prior to this interview Plaintiff had teaching experience as a substitute teacher at Bethune-Cookman College, an adult education teacher in the Oakland, California public school system and an instructor at Florida State University.

4. The faculty handbook, revised 1969, contains the employment policies of Howard University in regard to faculty contracts. The organization of the College of Liberal Arts is set forth in its by-laws.

5. According to the "Criteria of Appointments and Promotions to the Ranks of Instructor, Assistant Professor, Associate Professor, and Professor in the College of Liberal Arts, Howard University" an Assistant Professor shall hold a Ph.D or similar degree and have demonstrated proficiency in teaching according to the criteria established by the College.

6. Because Plaintiff met the criteria for appointment to the rank of Assistant Professor in the College of Liberal Arts the interview with Dr. Willis led to the University's offer, and Dr. Turgeon's acceptance, of a two year appointment as a non-tenured Assistant Professor in the Department, from August 1975 through May 1977. Assistant professors are appointed for two year periods and are eligible for reappointment.

7. Beginning in August of 1976, Dr. Martha Cobb, a Black female, became Chairman of the Department of Romance Languages, Dr. Willis having resigned her position in order to leave the area. During the academic year 1976–77, Dr. Turgeon continued to teach both undergraduate and graduate classes.

8. Recommendations for appointments, reappointments, promotion and tenure begin at the departmental level with the executive committee or the tenured faculty committee (depending upon whether there are enough tenured members). Such recommendations must be approved by the President of the University before the appointment, promotion, tenure or reappointment is official. The executive committee had the responsibility in 1976–1977 of recommending contract renewals.

9. In order to qualify for reappointment to the position of Assistant Professor, in addition to holding a Ph.D or similar degree and demonstrating proficiency in teaching according to the criteria established by the College, a candidate must demonstrate a record of scholarly research and publication, service to his or her department, and professional standing, evidenced by participation in conferences and the delivery of lectures and papers in his or her field.

10. Dr. Turgeon was a candidate for reappointment to the rank of Assistant Professor in spring of 1976. At that time, Plaintiff's French colleagues on the executive committee felt that she was an easy grader, inadequately prepared her students for their subsequent courses, did not keep office hours and did not attend committee meetings. They also expressed doubt about her publication record.

11. The executive committee in the spring of 1976 initially voted to renew Plaintiff's contract for one year. The committee was subsequently informed by the Dean of the College of Liberal Arts that the minimum appointment period for an Assistant Professor is two years. He informed the committee that they would have to renew Plaintiff's contract for two years or dismiss her.

12. The executive committee subsequently decided to reappoint Plaintiff to the rank of Assistant Professor for two years. She received a letter dated June 6, 1977, from Dr. Robert Owens, III, Dean of the College of Liberal Arts, notifying her that she was being reappointed for another

two-year term from August of 1977 through May of 1979. No qualifications, conditions, or reservations as to her reappointment were set forth in that letter.

13. Plaintiff directed an annual report to Dr. Cobb in August of 1977 informing the Chairman that her doctoral dissertation had been accepted for publication as a book by *Edition Naaman* on the condition that certain changes be made. Dr. Turgeon, who was then teaching one graduate course per semester, applied in the fall of 1977 to be accepted as part of the graduate faculty of the University and listed her credentials on her application. In February of 1978, in response to a solicitation regarding a proposed Department of Romance Language Newsletter, Dr. Turgeon submitted information concerning her professional accomplishments, student achievements, and awards. Plaintiff also sought a University grant to do research. This grant was awarded by the University in the spring of 1978.

14. In April of 1978 Plaintiff directed another annual report to Dr. Cobb. The annual report listed the accomplishments of Plaintiff during the previous year. Those accomplishments included: a grant from the University for the purpose of research, attendance at the South Atlantic Association of Modern Languages (SAMLA) Conference in Washington, D.C., member of the critical panel at the Sherbrooke University in Quebec, Canada, publication of book reviews for *XIX Century Studies,* and two translations in *L'Unite,* a Haitian newspaper.

15. The Howard University Faculty Handbook provides that all faculty members eligible for promotion shall have their credentials evaluated annually. The by-laws of the College of Liberal Arts provide that recommendations to the dean for appointments, reappointments, promotions and tenure within a department must be initiated by the department, and must have the approval of a majority of the tenured members of the department. The candidate's teaching proficiency is determined by a majority vote of the tenured members of the department, in adherence to the criteria established by the College for the evaluation of proficiency in teaching.

16. In the Department of Romance Languages, the only objective assessment of teaching proficiency was contained in the results of student evaluations, the results of which were compiled and expressed in numerical ratings and rankings. The By-Laws of the College of Liberal Arts provide that the committee considering recommendations for appointment, reappointment, promotion, and tenure shall insure that student evaluations are considered in any such recommendations.

17. Dr. Turgeon was evaluated by her students on three occasions, the most recent being in the early part of 1979. These evaluations showed her teaching was uniformly rated as excellent in that she was ranked number 4 out of 31 teachers.

18. Candidates for reappointment are usually considered for reappointment approximately eighteen months prior to the expiration of their current term. Plaintiff, therefore, was a candidate for reappointment in approximately the early part of 1978.

19. By letter dated May 17, 1978, Dr. Turgeon was notified that her then current appointment, which would expire May 31, 1979, would not be renewed. The University's notice of non-renewal was served upon Dr. Turgeon notwithstanding the University's usual practice under its procedural requirements that non-tenured faculty would be considered for reappointment during their current term of service by a faculty committee within their Department. A decision not to renew her contract was made in November of 1977, only two months after the commencement of her first reappointment. The evidence at trial confirmed the fact established before trial (which was the basis for the Court's order granting partial summary judgment) that Dr. Turgeon was never considered for reappointment by the appropriate departmental faculty committee.

20. The University presented no credible testimony that would justify or explain its

by-passing the required faculty committee consideration. There was no evidence that it had been previously done or that it had been authorized in this or any other department of the University. The University contended that minutes were not always taken at committee meetings. The University, however, produced no credible witnesses who could even recall a meeting in which Dr. Turgeon was considered for reappointment for the term of 1979–81.

21. By letter dated May 25, 1979, Plaintiff sought a grievance hearing within the University, alleging, *inter alia,* that her termination was in violation of the University's procedures. A preliminary hearing in September of 1980 resulted in the denial of her grievance on the ground that she failed to demonstrate a violation of her academic freedom as outlined in the University Faculty Handbook. The Committee did not address her allegations of procedural misconduct.

22. Having exhausted her remedies within the University, Dr. Turgeon's charge of racial discrimination was filed timely with the Equal Employment Opportunity Commission and was referred to the District of Columbia Office of Human Rights. On June 28, 1979 the Office of Human Rights found probable cause to believe that Plaintiff had been denied reappointment to the faculty at Howard University because she is white. On December 10, 1979, EEOC issued a "Determination" concluding that there was reasonable cause to believe that Plaintiff's charge was true. On September 8, 1981, EEOC issued to Plaintiff a "Notice of Right to Sue." Plaintiff's complaint was filed in this Court within 90 days of her receipt of her notification of right to sue.

23. Contemporaneously with Dr. Turgeon's termination, two other white Assistant Professors, Gary Brasor, Ph.D and Helen Aguera, Ph.D were terminated. At the April 4, 1979 meeting of the Tenured Faculty Committee, Antonio Planells, Ph.D, also a white Assistant Professor, was terminated. At that same meeting, six Black Ph.D's without tenure were considered for reappointment. Five of these six Ph.D's were reappointed as a result of that meeting. The only Black Ph.D rejected at that meeting, Dr. Aleida Portuondo, was subsequently retained on the faculty of Howard University at the recommendation of Chairman Martha Cobb and given tenure.

24. Many of the Black professors, specifically Maurice Lubin, Aleida Portuondo, and Karen Smyley, have been reappointed, promoted, or given tenure even though they were evaluated poorly by students or have ranked much lower than Plaintiff in the numerical ratings and rankings.

25. In addition to the above, other uncontradicted evidence adduced at trial from the University's own records showed that from the time Plaintiff began her employment in 1975 through 1981–82 the percentage of non-tenured Blacks in the Department of Romance Languages rose from 61% to 89%, and the percentage of non-tenured whites dropped from 39% to 11%. This resulted from the termination of white members of the faculty, retention of Black faculty members and the hiring of new Black faculty members. Between 1975 and 1982 twenty new faculty members were hired in the Department of Romance Languages, seventeen of whom were Black and only three of whom were white.

26. The statistical testimony, which accorded the University the advantage of assuming that the percentage of Blacks within the teaching profession in this specialty was 10%, showed that the mathematical probability of such a dramatic change in the racial composition of the Department of Romance Languages was infinitesimal unless race had been used as a basis for the Department's employment decisions.

27. The totality of the evidence adduced at trial, when coupled with the University's failure to explain or justify its actions through credible evidence at trial gives rise to a compelling inference of racially premised employment practices adversely affecting whites on the part of Defendant within the Department of Romance Languages.

**684**

*Defendant's Articulation of Non-discriminatory Reasons for Plaintiff's Termination and Plaintiff's Demonstration of Pretext*

28. Defendant Howard University advanced what it alleged were legitimate non-discriminatory reasons for the termination of Dr. Turgeon. These reasons were:

a. poor scholarly development, principally through the claim that the acceptance of Plaintiff's work for publication in *Editions Naaman* was not evidence of scholarship inasmuch as that publisher had no editorial board and "would print anything submitted for a price;"

b. that a student had complained that the content of one of Professor Turgeon's courses was "infantile;"

c. that Dr. Turgeon awarded inflated grades to students and that some of her students were poorly prepared for advancement; and

d. that Dr. Turgeon was absent from school on Wednesdays when Committees met, and failed to keep her office hours for students.

29. The reasons given by Defendant were destroyed by their own evidence as well as Plaintiff's demonstration of pretext. As to the last three reasons, all had been raised and discussed at a faculty committee meeting during Dr. Turgeon's first term of appointment in the spring of 1977. The fact that she received a regular two year reappointment in June of 1977 with no condition, qualifications or other caveats, leaves the unmistakable inference that neither the Committee nor the University felt that any such alleged shortcomings warranted her termination in the spring of 1977. The University failed to establish that any such alleged shortcomings either persisted or became aggravated during the time of her 1977–79 appointment because she was not evaluated or considered for reappointment.

30. As to the first reason, the evidence showed it too was probably considered prior to the issuance of Dr. Turgeon's 1977–79 reappointment, but it may possibly have been considered late in 1978. If considered in 1978, it would have been considered not in connection with any faculty committee consideration to terminate Plaintiff but in connection with Dr. Turgeon's application to become a member of the graduate faculty.

31. Plaintiff presented through cross-examination, witnesses, and exhibits, the following rebuttal evidence:

a. The acceptance of Plaintiff's dissertation for publication in *Editions Naaman* was indicative of good scholarly development, that publication being distributed in France by a well-established scholarly publishing house and in the United States by the largest foreign bookseller in this country;

b. The syllabus developed by Plaintiff for her survey course in 17th Century French Literature was found by an independent expert in the field to be "very acceptable," and the work required of students to be "very heavy," and was clearly not "infantile;"

c. Dr. Turgeon's grading of students did not involve "grade inflation" but was either done on standardized tests utilizing the Department's objective grading formula or assigned by her pursuant to her formal grading schedule and was consistent with grades assigned by other independent readers of the same papers;

d. Dr. Turgeon's alleged absences on Wednesday from committee meetings was due to the uncontradicted fact that her class schedule conflicted with the committee meetings;

e. Although her assigned office days to see students were Tuesday and Thursday, the number and frequency of student visits sometimes drew complaints from other faculty working in the same office; and

f. Dr. Turgeon, as well as other faculty members, was evaluated by the students on three occasions during her four years at the University. These evaluations, which were the only formal objective evaluations of teaching ability in the Department of Romance Languages, showed her teaching was uniformly rated

as excellent in that she was ranked number 4 out of 31 teachers.

32. With respect to the University's attempt to prove a non-discriminatory attitude through its testimony that faculties at most historically Black colleges are 58% Black and 15% white and that Howard's faculty is much more skewed in favor of whites, the Court rejects the same in totality. Official documents of both the federal government and Howard University conclusively show that faculties at other Black colleges average 39.8% white, whereas Howard's faculty is only 19.7% white.

33. Considering the reasons articulated at trial by the University as to Plaintiff's termination, and the rebuttal testimony and evidence, the Court finds the articulated reasons to be mainly undocumented after-the-fact attempts at justifications, and, in sum, to be pretexts. The true reason for Plaintiff's termination was the fact that she is white, and the evidence in its totality showed that her termination resulted from an intentional course of discriminatory conduct.

34. As a result of the University's termination of Dr. Turgeon she sustained damages by reason of the breach of her two year contract, for which monetary damages have been assessed by the jury. The jury also assessed damages by reason of Defendant's discriminatory treatment of Plaintiff under the District of Columbia Human Rights Act. Given this monetary award and the fact that Plaintiff's present job pays at a rate roughly equivalent to the rate she would have earned as an Assistant Professor at Howard University, she, therefore, has no damages in a strict legal sense under Title VII. The monetary relief awarded by the jury, however, does not include any payment for the delay in receiving her back pay, *i.e.*, prejudgment interest. Therefore, in an equitable sense she has not been made whole because of her wrongful removal from Howard University.

35. The record shows that after being turned down for reappointment in a manner not permitted by her contract and based on illegal considerations, Plaintiff has been unable to obtain employment as a college teacher. As of the time of trial, almost four full years after she was wrongfully terminated by Howard University, the best position that Plaintiff has been able to obtain is a secondary school language teacher.

36. Plaintiff invested considerable effort to qualify herself to be a University teacher. Plaintiff made a substantial investment of time and energy in an effort to remain at Howard University and had a reasonable expectation that decisions on reappointment would be made at the proper time by the appropriate persons based on a fair evaluation of her performance as measured against the appropriate criteria. Had Plaintiff been considered for reappointment by the appropriate committee at the appropriate time, and if race was not a factor in any consideration given to Plaintiff, she would more likely than not have been reappointed for another two year term.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–5(f)(3) *et seq.*

2. It is well settled that Title VII actions may be maintained by white individuals. *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 279–80, 96 S.Ct. 2574, 2578, 49 L.Ed.2d 493 (1976).

3. The allocation and order of proof in a Title VII action is well established. In a disparate treatment case under Title VII a Plaintiff must prove by a preponderance of the evidence a *prima facie* case of race discrimination. If the plaintiff sets forth a *prima facie* case of race discrimination, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for its action. If the defendant meets that burden, the plaintiff has the opportunity to prove by a preponderance of the evidence that the reasons offered by the defendant were not its true reasons but a pretext for discrimination. *McDonnell Douglas Corporation v. Green,* 411 U.S. 792,

804, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973).

■ 4. The *prima facie* case in disparate treatment cases under Title VII is set forth in *McDonnell Douglas Corp. v. Green.* A plaintiff may establish a *prima facie* case by showing (1) that he belongs to a protected class; (2) that he applied and was qualified for a job for which the employer was seeking applicants; (3) that despite his qualifications he was rejected; and (4) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of Plaintiff's qualifications. In addition, statistical evidence may establish a *prima facie* case of employment discrimination in an individual case. *Davis v. Califano,* 613 F.2d 957, 963 (D.C. Cir.1979).

■ 5. The elements of a *prima facie* case of employment discrimination are not confined to an inflexible formula, but necessarily vary from case-to-case, depending upon the underlying factual situation. *McDonnell Douglas Corp. v. Green,* 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13. In *Metrocare v. WMATA,* 679 F.2d 922, 925 (D.C.Cir.1982), the Court of Appeals for the District of Columbia Circuit reviewed the components of a *prima facie* case for failure to hire set forth in *McDonnell Douglas* and adapted it to a case of discriminatory discharge. The Court relied on *Flowers v. Crouch-Walker Corp.,* 552 F.2d 1277 (7th Cir.1977). In *Flowers,* the Court noted that a *prima facie* case of discriminatory discharge is established by showing: (1) that the plaintiff was a member of a racial minority; (2) that he was qualified for the job he was performing; (3) that he was satisfying the normal requirements in his work; (4) that he was discharged; and (5) that after his discharge the employer assigned white employees to perform the same work. *Flowers v. Crouch-Walker,* 552 F.2d at 1282. The significance of the last element of *Flowers* is that Plaintiff must present some evidence upon which to base an inference of discriminatory discharge beyond a simple showing that Plaintiff was a member of a racial minority and that he was qualified

for the job he was performing. *Coburn v. Pan American World Airways, Inc.,* Civil Action No. 81–1086, slip op. at 4 n. 3 (D.D.C. 1982).

■ 6. In a situation where a white individual claims discrimination under Title VII the *McDonnell Douglas* test must again be modified. The original *McDonnell Douglas* standard required the plaintiff to show that he belongs to a racial minority. White individuals, however, are allowed to prove a *prima facie* case of intentionally disparate treatment when background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority. *Parker v. Baltimore,* 652 F.2d 1012, 1017 (D.C.Cir. 1981). In these circumstances, a racially discriminatory environment will substitute for the first prong of the *McDonnell Douglas* criteria, membership in a racial minority. *Id.* at 1018.

■ 7. Plaintiff has made out a *prima facie* case of racial discrimination by demonstrating by a preponderance of the evidence that she was not reappointed because of her race. Plaintiff has established this *prima facie* case of race discrimination through evidence of disparate treatment and statistical analysis. First, Plaintiff has shown that although she is white, background circumstances support the suspicion that Defendant Howard University is that unusual employer who discriminates against the majority. Second, Plaintiff has shown that she was qualified for the job that she was performing, satisfied the normal work requirements, but yet, was discharged. Through testimony and documentary evidence, the Plaintiff established that she satisfied the objective criteria for reappointment as an Assistant Professor. Defendant's failure to evaluate Plaintiff and to consider her for reappointment as required by its own procedures weakens its attempts to argue that she was not qualified. Furthermore, the alleged shortcomings of the Plaintiff were aired prior to her reappointment in 1977. Although the University recognized that Plaintiff had "problems," they did not consider the problems to be such

that she was not qualified for reappointment in 1977. Because the University failed to show that such problems persisted or became worse between 1977 and 1979, the Court can only infer that Plaintiff was again qualified for reappointment.

8. Plaintiff also presented other evidence which creates a compelling inference of racial discrimination and satisfies the fifth element of the *Flowers* test. Significantly, the results of the student evaluations indicate that Dr. Turgeon had a superior ranking to many of the Black Ph.D's in the Department who were promoted, reappointed or given tenure. The only objective method for evaluating teaching proficiency were the student evaluations.

9. Plaintiff also demonstrated through statistical evidence that race was probably a factor in her discharge. From 1976 through 1982, the Department of Romance Languages hired only three whites out of twenty. The mathematical probability of this occurring unless race was a factor in the employment decisions was shown to be infinitesimal. In 1975 when Dr. Turgeon joined the staff of Howard University, the Department of Romance Languages was 39% white; by 1982 that percentage had decreased to 11%. This supports the conclusion that during the years Plaintiff was at Howard University, the number of Blacks in the Department of Romance Languages rose steadily while the number of whites declined.

10. The Defendant sought to articulate several legitimate non-discriminatory reasons for Plaintiff's discharge, as required by *McDonnell Douglas.* These reasons were that: (1) Plaintiff showed poor scholarly development; (2) a student had complained that the content of a course was infantile; (3) Dr. Turgeon awarded inflated grades to students and some of her students were poorly prepared for advancement; and (4) Dr. Turgeon was absent from school on Wednesdays and failed to attend committee meetings and to keep office hours for students.

11. Plaintiff presented evidence and testimony sufficient by a preponderance of the evidence to prove that Defendant's reasons were pretexts. She demonstrated that publication in *Editions Naaman* is indicative of good scholarly development. The syllabus developed by Plaintiff was found to be very acceptable and the work required of the students to be very heavy. Dr. Turgeon's grading did not involve grade inflation as she graded according to an objective grading formula within the department and her grades were consistent with other readers of the same paper. Finally, Plaintiff presented testimony to show that her alleged absences on Wednesdays from meetings or from her office were due to uncontradicted facts that her class schedule conflicted with the committee meetings and the number and frequency of student visits often drew complaints from other faculty working in the same office.

12. Any contention that Plaintiff was denied reappointment based solely on her teaching proficiency was destroyed by Defendant's own survey of the Department's faculty. Between 1975 and 1979, based on the Teacher Course Evaluation Survey, Dr. Turgeon consistently scored very high in that she ranked fourth out of thirty-one teachers. Dr. Portuondo, a Black professor consistently scored at the bottom of the survey but was not terminated by Defendants and subsequently received tenure. Similarly, other Black professors who scored much lower than Dr. Turgeon were not discharged from their position and were subsequently reappointed.

13. In sum, Plaintiff has demonstrated that she was discharged from Howard University because she is a white woman. She is therefore, entitled to judgment under Title VII on her claim of racial discrimination in the denial of reappointment under Title VII.

14. The Court is authorized to order Plaintiff's reinstatement pursuant to 42 U.S.C. § 2000e–5(g). *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). By reason of the uncompensated damage referred to in the Court's findings due to the special circumstances herein, Plaintiff as the prevail-

ing party is entitled to be reinstated to her position as Assistant Professor for the normal two-year term in order to restore her fully to the level of teaching from which she had prepared herself for over many years. Plaintiff will then be able to be considered by the appropriate committee for reappointment at the appropriate time.

15. The Court is also authorized by 42 U.S.C. § 2000e–5(g) to fashion equitable or other remedies as may be appropriate. Prejudgment interest has been awarded by numerous courts under Title VII in private sector cases on the theory that it is necessary to restore plaintiffs to the economic position in which they would have been put but for discrimination. *See e.g. Taylor v. Philips Industry, Inc.*, 593 F.2d 783, 787 (7th Cir.1979). In this case because Plaintiff's present job pays at a rate roughly equivalent to the rate she would have earned as an Assistant Professor at Howard University and a jury has fixed a sum of monetary damages under the District of Columbia Human Rights Act and for a claim of breach of contract, Plaintiff has no damages in a strict legal sense under Title VII. In order to make Plaintiff whole as a result of her wrongful termination, the Court will require Defendant to pay prejudgment interest thereon at the rate fixed by D.C.Code § 28–3302(c).