Sidney BISHOPP, et al., Plaintiffs,

v.

DISTRICT OF COLUMBIA, Defendant.

Civ. A. No. 83–0417.

United States District Court, District of Columbia.

Feb. 26, 1985.

Eileen M. Stein, Chevy Chase, Md., Douglas B. Huron, Washington, D.C., for plaintiffs.

Cary D. Pollak, George C. Valentine, Washington, D.C., for defendant.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

Plaintiffs Sidney Bishopp, John Breen, William Q. Stickley, Floyd E. Yocum and Joseph E. Zeis, all white males formerly employed by the District of Columbia Fire Department, bring this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* (1981) ("Title VII"), alleging racial discrimination, retaliation and constructive discharge. Plaintiffs' claims arise from the August, 1974 promotion of Jefferson Lewis, a black male, to Assistant Fire Chief-Operations. Lewis was nominated for promotion by then-Fire Chief Burton Johnson; that nomination was approved by then-Mayor Walter E. Washington. Each plaintiff contends that he was better qualified than Lewis to fill the position in question, and that the Lewis appointment was based on race. Plaintiffs further allege that as a consequence of their opposition to Lewis' appointment, they were subjected to retaliatory discrimination and that they were constructively discharged from the fire department.

Plaintiffs' charges of race discrimination were placed before the Equal Employment Opportunity Commission (EEOC) on or about August 30, 1974. After extensive delay, the EEOC issued findings in plaintiffs' favor on February 25, 1982. A formal notice of right to sue followed on November 18, 1982, and plaintiffs filed this action on February 15, 1983. The Court having denied defendant's motion for dismissal or summary judgment based on laches and other theories,[1] the case proceeded to trial in October, 1984. Post-trial memoranda have been filed subsequently.

Defendant has consistently maintained that the promotion of Jefferson Lewis was based on merit rather than race. Alternatively, defendant defends the Lewis promotion under the fire department's fledgling 1974 affirmative action plan. In light of defendant's uniform statements that race played no part in the selection of Jefferson Lewis, admission of the 1974 affirmative action plan was denied at trial,

---

1. In light of a material factual dispute as to (1) plaintiffs' knowledge of the statutory provision construed to authorize a Title VII suit prior to conclusion of protracted EEOC proceedings, and (2) plaintiffs' access to legal advice while EEOC charges were pending, the defendant's motion for summary judgment based on laches was denied. *See* March 16, 1984 Order at 5–7. Defendant's potentially dispositive motions addressing the scope of Title VII, the effect of D.C.Code § 4–302, *res judicata* and collateral estoppel were denied in the March 16, 1984 Order as a matter of law.

and that defense will not be given further consideration. Defendant also raised a defense of laches based on plaintiffs' failure to bring their claims to this court when the EEOC proceedings continued beyond 180 days from the date of filing. *See* footnote 1. The Order of March 16, 1984 stated the applicable legal test:

> In the context of a Title VII action, the application of laches is inappropriate unless the defendant proves both that the delay of the plaintiff was unreasonable and that the defendant has been unduly, substantially and materially prejudiced as a result. *Rozen v. District of Columbia,* 702 F.2d 1202 (D.C.Cir.1983).

March 16, 1984 Order at 5. The laches issue was not ripe for summary judgment at the time of the above Order, but it was indicated that absent evidence that plaintiffs did know or should have known of their opportunity to file suit without an EEOC decision, dismissal on the ground of laches would be inappropriate under *Rozen.* At trial, each plaintiff testified unequivocally that he did not know of his option under Title VII to institute a lawsuit without awaiting the outcome of EEOC proceedings when those proceedings extended beyond 180 days from filing. In addition, each plaintiff testified that he was not represented by counsel while the EEOC charges were pending. As the authority to file suit before completion of EEOC proceedings is not evident from the face of the statute, *see* 42 U.S.C. § 2000e–5(f)(1) (apparently authorizing suit only when plaintiff has received notification of option to sue despite agency delay), *see generally Occidental Life Ins. Co. of Cal. v. EEOC,* 432 U.S. 355, 366, 97 S.Ct. 2447, 2454, 53 L.Ed.2d 402 (1977), the plaintiffs have satisfactorily shown that their delay in filing this action was not unreasonable. Even were plaintiffs' delay unreasonable, defendant has made no showing that the delay has unduly, substantially and materially hampered defendant in its ability to defend this suit. Specifically, there has been no claim that relevant documents were lost over the course of time, and the District of Columbia officials alleged to have discriminated against plaintiffs (former Chief Johnson and former Chief Lewis) both appeared at trial with memories intact. Accordingly, under *Rozen,* this action is not barred by laches.

### Factual Background

Discussion of the merits of plaintiffs' claims requires some knowledge of the setting in which those claims arose. The District of Columbia Fire Department is hierarchical in structure. At the top of the hierarchy is the fire chief; directly beneath him are the assistants heading the operations and services sectors of the department. The bulk of the department's manpower is in the operations sector, which includes five deputy fire chiefs (ranked one level below the assistants) and some thirty battalion fire chiefs who report to the deputies. Three of the five operations deputies are responsible for firefighting operations, one runs the training center and the fifth is the fire marshal with responsibility for fire prevention efforts. Of the battalion fire chiefs in operations, most are involved in firefighting, although one serves under the deputy heading the training academy.

In the services sector, the assistant fire chief is aided by one deputy and a battalion fire chief for planning, both of whom report directly to the assistant chief. Despite the staffing imbalance, positions in the two sectors are considered equivalent for purposes of rank and promotion. Promotions through the lower ranks of private, sergeant, lieutenant and captain, up to and including battalion fire chief, are based on test scores and years in rank or grade. Under D.C.Code § 4–302 (1981) promotions above battalion fire chief are made at the discretion of the Mayor upon the recommendation of the fire chief. Moreover, no fire department policy, rule or regulation mandates rank by rank advancement above the level of battalion fire chief: the only prerequisite to promotion to deputy, assistant or even fire chief is that the officer must have attained the rank of battalion fire chief. See DX–A.

At issue in this case is the promotion of Jefferson Lewis, a black, from battalion fire chief to assistant fire chief for operations ("AFC-Operations") in August 1974. At the time of the Lewis promotion, four of the five plaintiffs were ranked as deputies, Breen as the fire marshal, Stickley and Bishopp in firefighting, and Zeis at the training academy. The fifth plaintiff, Yocum, was a battalion fire chief assigned as Zeis' assistant in training.

During the summer of 1974, it was apparently well known throughout the fire department that then-AFC-Operations Doyle E. Harpster's position would become vacant upon his imminent retirement. After reviewing the backgrounds of all battalion and deputy chiefs, then-Fire Chief Johnson prepared a list naming the eight individuals (including plaintiffs and Jefferson Lewis) who were considered the "best candidates" to fill the upcoming vacancy. PX–71, DX–JJ. Formal applications for the job were neither solicited nor received. In late August, 1974, defendant, through Chief Johnson (who is black) and the office of Mayor Walter E. Washington (who is also black) announced that the AFC-Operations vacancy created by Harpster's retirement would be filled by Jefferson Lewis. The promotion took effect within days.

*Race Discrimination Claim*

■ With that background, we turn to the merits of plaintiffs' claim that they were passed over for promotion (in the case of the deputies) or simply not promoted because they are white. The structure of Title VII discrimination litigation is by now well settled law. Under *United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983) and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the plaintiffs bear the burden of proving by a preponderance of the evidence a prima facie case of race discrimination. *Burdine* at 253, 101 S.Ct. at 1093. The burden of establishing a prima facie case is not onerous. *Id.* at 253, 101 S.Ct. at 1093, *see also Ethnic Employees of the Library of Congress v. Boorstin*,

751 F.2d 1405, 1416 (D.C.Cir.1985). In the context of a failure to promote, plaintiffs must show (1) that they belong to a protected group, (2) that they were qualified for and applied for a promotion, (3) that they were considered for and denied the promotion, and (4) that a similarly-qualified employee from outside the protected group was promoted at the time that plaintiffs were denied promotion. *Bundy v. Jackson*, 641 F.2d 934, 957 (D.C.Cir.1981); *see also Parker v. Baltimore & O.R.R. Co.*, 652 F.2d 1012, 1017 (D.C.Cir.1981); *Sales v. Dep't of Justice*, 549 F.Supp. 1176, 1184 (D.D.C.1982), *aff'd*, 717 F.2d 1480 (D.C.Cir. 1983); *see generally Burdine*, 450 U.S. at 253 n. 6, 101 S.Ct. at 1094 n. 6 (model for prima facie case of discrimination in hiring set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), is adaptable to varying factual situations). By establishing a prima facie case, the Title VII plaintiff creates a "rebuttable presumption" of unlawful discrimination by the employer. *Aikens*, 460 U.S. at 714, 103 S.Ct. at 1481, *citing Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094; *McDonnell Douglas Corp. v. Green*, *supra*. To rebut the presumption, the defendant must produce evidence that the plaintiffs were rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. If defendant does so, the presumption "drops from the case", *Burdine*, 450 U.S. at 255 n. 10, 101 S.Ct. at 1095 n. 10, and the ultimate factual issue—whether or not the defendant intentionally discriminated against the plaintiffs—is placed before the Court. *See Lanphear v. Prokop*, 703 F.2d 1311, 1314 (D.C.Cir.1983). Throughout the proceedings

'The plaintiff retains the burden of persuasion. [H]e may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.' 450 U.S. at 256 [101 S.Ct. at 1095].

In short, the district court must decide which party's explanation of the employer's motivation it believes.

*Aikens,* 460 U.S. at 714–16, 103 S.Ct. at 1481–82; *see also Cooper v. Federal Reserve Bank of Richmond,* —— U.S. ——, ——, 104 S.Ct. 2794, 2799, 81 L.Ed.2d 718 (1984); *Ethnic Employees of the Library of Congress v. Boorstin,* at 1416.

■ Title VII affords protection to white plaintiffs subjected to race-based discrimination. *See McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 280, 96 S.Ct. 2574, 2578, 49 L.Ed.2d 493 (1976); *see also Lanphear v. Prokop,* 703 F.2d 1311. To establish the first element of the prima facie case (membership in a protected class), the white plaintiff cannot merely state his race; he must show that "background circumstances support the suspicion that the defendant is the unusual employer who discriminates against the majority." *Lanphear v. Prokop,* 703 F.2d at 1315, *quoting Parker v. Baltimore & O.R.R. Co.,* 652 F.2d at 1017. If he meets that requirement and also shows that he was qualified for the position in question but was rejected in favor of a member of a racial minority, he has met his burden of showing rejection "under circumstances which [despite the plaintiff's majority status] give rise to an inference of unlawful discrimination." *Lanphear v. Prokop,* 703 F.2d at 1315, *quoting Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093; *see also Turgeon v. Howard University,* 571 F.Supp. 679, 686 (D.D.C.1983).

■ Courts examining "background circumstances" have found that evidence of "irregular acts of favoritism" towards minority employees, racial disproportionality in promotions, and evidence of pressure within an agency to increase the percentage of minority employees will support a suspicion that an employer discriminates against minority employees. *See Lanphear v. Prokop,* 703 F.2d at 1315; *Parker v. Baltimore & O.R.R. Co.,* 652 F.2d at 1017. Defendant did not challenge this prong of plaintiffs' prima facie case in the motion for directed verdict at the close of plaintiffs' case in chief. However, evidence of the necessary background circumstances is not strong—plaintiffs have es-

tablished this element by only the thinnest of margins. The fact that Chief Johnson and Mayor Washington, the two persons responsible for the Lewis selection, are black is by itself insufficient to raise the suspicion that defendant discriminates against the majority. *See Plummer v. Bolger,* 559 F.Supp. 324, 329 (D.D.C.), *aff'd,* 721 F.2d 1424 (D.C.Cir.1983). Furthermore, there is no evidence of irregular acts of favoritism or disproportionate promotion of blacks within the fire department. In August 1974, the upper levels of the fire department were dominated by whites, and until the Lewis promotion the *only* black to have advanced above battalion chief in the 1970s was Burton Johnson, who became a deputy chief in 1971 and fire chief in 1973. PX–66. The Lewis appointment did not start a noticeable trend—the next two assistant chief vacancies were filled by whites, and not until April 1978 did the next black reach that level in the hierarchy.

■ Evidence does show, however, that in 1974 the fire department was at least drafting if not adopting an affirmative action program. This evidence suggests at least some pressure to improve the lot of minorities within the department, perhaps to the disadvantage of whites. On that minimal basis, and in light of defendant's apparent concession that this prong of plaintiffs' prima facie case was not subject to challenge on a motion for directed verdict, plaintiffs have satisfactorily shown circumstances from which a proclivity to discriminate can be inferred. Although there was no formal application process, plaintiffs have shown that by their rank they were eligible for promotion to AFC-Operations and that they were in fact placed on Chief Johnson's list of personnel considered for the vacancy. PX–71; DX–JJ. Finally, there is no question that plaintiffs were rejected in favor of Jefferson Lewis, who is black. Thus, plaintiffs have carried their burden of establishing a prima facie case of race discrimination.

■ The burden of producing evidence now shifts to defendant, which must articu-

late a legitimate nondiscriminatory reason for rejecting plaintiffs *or* for preferring Lewis. *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094. This has been done. At trial, Chief Johnson denied that the Lewis promotion was based on race and pointed to Lewis' impressive standing as one of the top three candidates vying for the position of fire chief in 1973 as the factor placing Lewis ahead of his competitors for AFC-Operations. Defendant also identified qualities perceived as weaknesses in four of the five plaintiffs. When making his selection he believed that Stickley and Bishopp lacked essential firmness and decisiveness, and he doubted the abilities of Zeis and Yocum to adequately resolve problems in light of their performance in the face of problems at the training school. Chief Johnson acknowledged the competence of plaintiff Breen, but testified that in 1974 he believed that the interests of the fire department would be best served in Breen continued in his role as fire marshal, where his skills were greatly needed. Each of these reasons for Lewis' selection and plaintiffs' rejection, if true, is legitimate and nondiscriminatory, and thus defendant has placed the burden on plaintiffs to "demonstrate by a preponderance of the evidence that the facially legitimate reason offered by the defendant was not its true reason but rather a pretext for discrimination." *Lanphear v. Prokop*, 703 F.2d at 1314. As shown below, plaintiffs have not carried that burden.

In their case in chief, each plaintiff testified as to his own history with the fire department, his progression through the ranks, breadth of experience, relevant education and training. Several (most notably plaintiffs Bishopp and Breen) submitted letters of commendation from their personnel files as testament to their performance on duty. All except Yocum had served as acting AFC-Operations while in the rank of deputy and/or battalion chief, and thus had familiarity with the duties of the job.

The evidence demonstrates that in most areas *pinpointed by plaintiffs*, the records of plaintiffs were superior to that of Lewis at the time of the selection. All of the plaintiffs were senior to Lewis by years of service; four were his senior by rank. Plaintiffs Breen, Bishopp and Zeis had taken courses in such relevant matters as fire engineering and nuclear safety; Lewis did not have comparable credits. By virtue of their service as deputy chiefs, four of the plaintiffs had gained some administrative experience and daily contact with Chief Johnson, whereas Lewis had no administrative duties or opportunity for frequent contact with Chief Johnson.

Without derogating from the overall abilities of the plaintiffs or challenging the credentials recited above, Chief Johnson testified that he saw qualities in Lewis that he believed to be lacking in various plaintiffs. From his vantage point as fire chief, Johnson had concluded that Stickley and Bishopp, despite their high rank, were indecisive and did not display the firmness he saw in Lewis. As to Zeis and Yocum, Johnson testified that the training program which they ran had been plagued with persistent (albeit unofficial) complaints stemming from allegedly high failure rates among blacks at the academy. Exhibits produced at trial do not document the failure rate among blacks; however, even if no racial disparity existed in fact, it nonetheless appears that the unofficial complaints planted doubts about Zeis and Yocum in Johnson's mind.

Furthermore, the testimony of Chief Johnson demonstrates that Jefferson Lewis was a strong contender in his own right. When the job of fire chief became vacant in 1973, Lewis applied for the position, thereby demonstrating his initiative and ambition. More importantly, he made an impressive showing to the panel filling that vacancy, and in the final rankings by that panel Lewis placed among the top three candidates considered. The biracial panel gave top recommendations to one white and two blacks (Johnson and Lewis) and there is no indication that its recommendations were racially motivated. As a candidate (indeed, the successful candidate) for fire chief in 1973, Johnson was well aware of the rigors of the selection process and

felt confident trusting the judgment of the 1973 panel with respect to Lewis' leadership and potential.

At the close of the evidence, plaintiffs had shown beyond dispute that each of them was, overall, a highly qualified candidate for the position of AFC-Operations. What they failed to show is that defendant discriminated on the basis of race by giving greater weight in the selection process to factors which plaintiffs considered relatively unimportant. Under the criteria applied by plaintiffs (seniority, education, breadth of experience and the like) plaintiffs emerge as superior to Lewis. However, no fire department policy mandated consideration of *any* of those criteria, and in fact, the eligibility of all battalion and deputy chiefs for higher level administrative positions indicates that years in service or rank count for little in those appointments. The presence of Yocum (another battalion chief) as a plaintiff in this lawsuit underscores the fact that deputies and battalion chiefs are equally eligible to be in the applicant pool.

Chief Johnson testified that he gave greatest weight to the 1973 fire chief panel recommendations, and as a recent candidate before that panel he knew firsthand the qualities it valued. Plaintiffs correctly state that the candidate receiving the second highest marks from the panel (Battalion Chief Webb, a white) was not considered for AFC-Operations, but it does not follow that Chief Johnson's claimed reliance on the panel's views is a pretext masking racial discrimination. Chief Johnson testified that his decision not to even consider moving Webb from his duties as the head of the department's ambulance service was based on the needs of the department. According to Johnson, Webb was invaluable in that position, and his removal from the post would be detrimental to the department as a whole. Webb is not a plaintiff to this action.

In a similar vein, no pretext is found in defendant's decision not to uproot plaintiff Breen from his job as fire marshal. Breen had served directly under Johnson when Johnson was fire marshal and had succeeded him as fire marshal when Johnson became fire chief. Johnson's selection to the top position heralded the third consecutive time that the fire marshal had been appointed fire chief. One can, therefore, readily empathize with Breen's wounded expectations. However, like Webb, Breen was seen by Johnson as indispensable in his position, and all evidence in the record from all parties indicates that Breen performed his job admirably. The wisdom of a decision to effectively restrain the upward mobility of an outstanding employee in the interests of lower-level stability is not at issue here. At most, plaintiff Breen might state a claim of competence-based discrimination, but Title VII does not cover such a cause of action.

Finally, even if the development of affirmative-action policies in the fire department during the 1970s created pressure within the department to hire minorities, there is no convincing evidence that Chief Johnson bowed to such pressure in appointing Lewis. Two subsequent appointments to AFC positions (both in services) during Chief Johnson's term went to whites (Charles Burger in December 1974 and John Devine in 1976). After Lewis, the next promotion of a black to AFC occurred in 1978, by which time Chief Johnson had retired. (*See* PX–66.) [2] The *only* evidence of pressure on Johnson came out through the testimony of plaintiff Breen, who stated that Johnson had admitted to him before the promotion that he faced pressure to choose Lewis because of his race. No witnesses corroborated that testimony, and Johnson flatly denied it. Breen's allegation was made for the first time at trial, and he gave no convincing explanation for

**2.** Plaintiffs' Exhibit 66 erroneously indicates that Jon Devine was made both AFC-Services and AFC-Operations in August 1976. The testimony at trial and other documents in the record show that Devine was apppointed AFC-Services in August 1976, but moved to AFC-Operations when Lewis vacated that position in March 1978 to become fire chief. At that time, Calvin Watson, who is black, became AFC-Services as Devine's replacement.

his failure to bring Johnson's alleged admission to light at an earlier stage of the proceedings. Moreover, Breen's testimony conflicts with his earlier statement to the EEOC that he first learned of the Lewis promotion through newspaper accounts after the fact. Under these circumstances, Chief Johnson's version is the more credible.

Although each plaintiff has proven through testimony and documentation that he was an asset to the District of Columbia Fire Department and most likely would have performed well as AFC-Operations, none has made a case of racial discrimination from the promotion of Jefferson Lewis. As a valid, legitimate, nondiscriminatory reason for the Lewis selection has been proven, the Court cannot second-guess that choice:

> [T]he employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria. The fact that a court may think that the employer misjudged the qualifications of the applicants does not in itself expose him to Title VII liability . . . .

*Burdine,* 450 U.S. at 259, 101 S.Ct. at 1097, *citing Loeb v. Textron, Inc.,* 600 F.2d 1003, 1012 n. 6 (1st Cir.1979); *see also Sales v. Dep't of Justice,* 549 F.Supp. at 1184. Accordingly, judgment will be entered for defendant on plaintiffs' claim of race discrimination in the 1974 promotion of Jefferson Lewis to AFC-Operations.

*Retaliatory Harassment Claim*

Apart from their claim of discriminatory nonselection for AFC-Operations, plaintiffs assert that as a result of their opposition to the Lewis promotion, they were subjected to retaliatory harassment by defendant in violation of Title VII. The outcome of the first claim will not determine the success of the second.

The order of proof set forth in *Aikens, Burdine* and *McDonnell Douglas, supra,* is applicable to claims of retaliation:

> In order to establish a prima facie case of retaliation, plaintiff[s] must show: (1) that [they] engaged in a statutorily protected activity, (2) that the employer took an adverse personnel action, and (3) that a causal connection existed between the two. As in a case of disparate treatment, this initial burden is not great. Plaintiff[s] merely need to establish facts adequate to permit an inference of retaliatory motive. Once this burden has been met, defendant must articulate a legitimate, nondiscriminatory reason for the personnel action. At that point, plaintiff must prove by a preponderance of the evidence that the proffered reason was but a pretext for retaliation.

*McKenna v. Weinberger,* 729 F.2d 783, 790 (D.C.Cir.1984) and cases cited at nn. 50–52 therein.

Plaintiffs have shown that shortly after the Lewis promotion was announced, they filed charges with the EEOC alleging that the appointment was racially motivated. The institution of those charges was clearly protected activity. *See* 42 U.S.C. § 2000e–3.

Plaintiffs see a causal link between their opposition to the Lewis appointment and numerous disagreements between them and their supervisors during plaintiffs' remaining years at the fire department. Plaintiffs' specific allegations of retaliatory conduct are as follows:

1. In the fall of 1974, Yocum was laterally transferred from the training academy to another battalion fire chief position. Neither he nor his supervisor, Deputy Chief Zeis, requested the transfer, and neither was consulted before the transfer was ordered.

2. Upon receipt of a letter dated October 24, 1974 from Yocum stating his intention to seek retirement, criticizing the selection process for fire chief and AFC-Operations as "devoid of merit considerations in deference to black racism", leveling broader charges of black racism affecting the fire department, and accusing Chief Johnson of lying (DX–AA), Chief Johnson endorsed Yocum's retirement.

3. In late 1974, equal employment opportunity (EEO) duties which had been assigned to Zeis were taken from him and reassigned to another officer.

4. An affirmative action plan for 1974–75 prepared by Zeis and submitted to the office of the fire chief for revisions was never returned to Zeis.

5. None of the plaintiffs was selected to fill vacancies at the assistant chief level arising after they filed EEOC charges.

6. Shortly after becoming AFC-Operations, Lewis made numerous comments to plaintiff Bishopp to the effect that "blacks are in and whites are out" in the fire department.

7. Between August 1974 and August 1976, Lewis said to Stickley, "I think my promotion is getting next to you," or made similar remarks.

8. As AFC-Operations, Lewis (1) objected to Breen's participation in promotion decisions affecting officers Breen supervised, and (2) challenged Breen's presence at a fire site on one occasion.

9. In October 1974, Chief Johnson responded to Breen's attempt to ease alleged tension over the Lewis promotion by saying, "I want nothing to do with you."

10. In October 1977, Breen was laterally transferred from the fire marshal post to the training academy. He did not request the transfer.

Whether the actions listed above constitute "adverse personnel actions" or harassment for purposes of establishing a prima facie case of retaliation is debatable. The alleged verbal remarks of Johnson and Lewis never amounted to threats and were not followed with specific personnel actions, and none of the plaintiffs was ever demoted. Even assuming that the incidents cited above adversely affected the plaintiffs and that there is a causal link between those incidents and the plaintiffs' filing of EEOC charges, defendant has stated a legitimate, nondiscriminatory reason for each of its challenged actions, and plaintiffs have not punctured the credibility of defendant's explanations.

■■■ Rather than acts of punishment, the lateral transfers of Yocum and Breen appear from the evidence to be reactions to departmental needs. Given Johnson's doubts (whether well-founded or not) as to Yocum's contribution to the training program even *before* the Lewis promotion, it is not surprising that a transfer was ordered. The 1977 Breen transfer was made for an equally legitimate reason—to place Breen where his skills were most needed. Despite Breen's claim that the fire marshal position was a stepping-stone to the department's top office, the evidence does not show that appointments to top offices followed *any* pattern, except that vacancies within the services sector were more often than not filled from within that sector.

Plaintiffs have pointed to isolated situations in which they drew criticism from Johnson or Lewis (see item 8 above) or were not given feedback (see item 3), or in which they felt stripped of responsibilities (see items 4 and 8). Defendant has convincingly explained that each incident resulted from a business decision made in the interests of sound management. For example, Lewis challenged Breen's presence on the promotion board not as an act of retaliation but because the candidates for promotion were Breen's own men whom he had already recommended—his input at the board level would be redundant. Likewise, Zeis was removed as EEO officer during a major overhaul of the entire human rights program, not because he opposed one promotion. It has not been shown that these and defendant's other explanations are pretextual. Moreover, the infrequency of such incidents over time suggests that retaliation was not at play. Like most employees, these plaintiffs occasionally did not see eye to eye with their supervisors, but the bulk of their work went without criticism.

As to plaintiffs' nonpromotion to AFC-level positions after the Lewis appointment, plaintiffs have raised no specific challenge to defendant's decision to fill the 1974 and 1976 AFC-Services jobs with officers hav-

ing prior experience in the services sectors. The next AFC-Operations' opening arose in 1978 (by which time only Breen was still employed at the fire department), but was filled when Assistant Chief Devine laterally transferred from AFC-Services. Breen has introduced no evidence to indicate that he and Devine (both white) were equally qualified for the position and that his non-selection was retaliatory.

Finally, Johnson and Lewis deny making the remarks attributed to them by individual plaintiffs (see items 6, 7, 9). None of these remarks was corroborated by the testimony of a second witness, and none comports with the evidence bearing on defendant's treatment of plaintiffs after the Lewis promotion. For example, if "whites were out" at the fire department as of 1974, it is not likely that the next two assistant chief openings would have gone to whites, which they did. Had Johnson meant to have "nothing to do with" Breen, he likely would have immediately moved Breen from a position that, by plaintiffs' own testimony, put the two in frequent contact with each other. Johnson took no such action for two and a half years, and even then he had legitimate independent reasons to effect Breen's transfer. Under these circumstances, plaintiffs have not proven by a preponderance of the evidence the claimed verbal harassment. Furthermore, as discussed above, they have not proven that any actions of defendant were more likely than not retaliatory or shown defendant's proffered explanations to be unworthy of credence. Accordingly they have not shouldered their burden of proof. *See Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095, *McKenna*, 729 F.2d at 790.

### Constructive Discharge Claim

Plaintiffs' claim of constructive discharge is closely entwined with their claim of retaliatory harassment. Essentially, plaintiffs assert that conditions at the fire department compelled their premature retirement. Plaintiffs Zeis, Bishopp and Yocum each retired within the last two months of 1974; Stickley retired in August 1976, and Breen in October 1978. Each was eligible to remain with the department to age 60, absent dispensation to stay up to four years longer. Thus, the latest *normal* retirement dates for each would be:

| | |
|---|---|
| Zeis | September 2, 1974 |
| Bishopp | April 27, 1977 |
| Yocum | April 23, 1981 |
| Stickley | August 20, 1980 |
| Breen | December 25, 1982 |

In this Circuit and others, "a finding of constructive discharge depends on whether the employer deliberately made working conditions intolerable and drove the employee into an involuntary quit." *Clark v. Marsh*, 665 F.2d 1168, 1173 (D.C. Cir.1981) (citations omitted); *see also* cases cited therein and *Geisler v. Folsom*, 735 F.2d 991, 996 (9th Cir.1984). Even proof of discrimination is not a sufficient predicate for a finding of constructive discharge; there must be "aggravating factors" present as well. *Geisler v. Folsom*, 735 F.2d at 996, *quoting Clark v. Marsh*, 665 F.2d at 1173–74.

In this case, plaintiffs have proven neither discrimination nor the existence of aggravating factors sufficient to support a finding of constructive discharge. The incidents which, in plaintiffs' eyes, compelled an "involuntary quit" are the same incidents they viewed as retaliatory. As discussed above, those incidents were neither extreme nor frequent; more importantly, each has been convincingly explained as a legitimate, nonretaliatory action consistent with sound management. Even if plaintiffs believed their circumstances to be intolerable and therefore retired, they have not shown that their belief was a reasonable reaction to particular actions by defendant. In short, they have not shown that as an objective matter, they were "driven" to quit. *See Geisler v. Folsom*, 735 F.2d at 996 (applying test of reasonableness to employee's decision to resign).

For the reasons discussed above, plaintiffs have not carried their burden of proving, by a preponderance of the evidence, their claims of racial discrimination, retaliatory harassment or constructive discharge.

Accordingly, judgment shall be entered in favor of defendant and against plaintiffs.