Sidney BISHOPP, et al., Appellants,

v.

DISTRICT OF COLUMBIA, a municipal corporation, Appellee.

No. 85–5329.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 6, 1986.

Decided April 18, 1986.

Douglas B. Huron, with whom Eileen M. Stein, Washington, D.C., was on brief, for appellants.

William J. Earl, with whom John H. Suda and Charles L. Reischel, Washington, D.C., were on brief, for appellee.

Before: WALD, SCALIA and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

Concurring opinion filed by Circuit Judge WALD.

I

SILBERMAN, Circuit Judge:

Five white males, Sidney Bishopp, John Breen, William Q. Stickley, Floyd E. Yocum and Joseph E. Zeis appeal from the district court's judgment in favor of the District of Columbia denying their Title VII claims. Appellants, now retired from the District of Columbia Fire Department, allege that in 1974 they were discriminatorily denied promotion to the position of Assistant Fire Chief—Operations (AFCO). The position was filled instead by Jefferson Lewis, a black male. Appellants further claim that the Fire Department retaliated against them because they filed charges with the Equal Employment Opportunity Commission (EEOC) and that, eventually, they were constructively discharged. The district court found for the District of Columbia on all counts. We reverse the district court's judgment on the promotion claim, vacate the judgment as to the retaliation and constructive discharge claims, and remand all the claims for further consideration.

The ultimate factual issue, the question of discriminatory motivation in the promotion decision, is at the heart of this legal dispute. But the subordinate facts are, for the most part, undisputed. In August 1974 the incumbent AFCO retired. The AFCO, whose office we surmise from the record is a "line" position in management parlance, and the Assistant Fire Chief—Services, whose office we understand to be a "staff" position, are the immediate subordinates of the Fire Chief. The AFCO directly supervised five Deputy Chiefs, three of whom worked in the Firefighting Division and in turn supervised a number of Battalion Chiefs. The fourth Deputy Chief served as Fire Marshal and the fifth ran the department's training center. Promotions up to and including the rank of Battalion Chief were made on the basis of test scores and years of service, but promotions above that rank were within the discretion of the Mayor, D.C. Code Ann. § 4–302 (1981). The only requirement for promotion to the top jobs was that the candidate be of Battalion Fire Chief rank or higher. Thus, the Mayor was free to promote a Battalion Fire Chief directly to an Assistant Fire Chief position, but in practice that rarely happened. By August 1974 the position of

Assistant Fire Chief had been filled nine times. Only on one occasion had a Battalion Fire Chief been elevated directly to the rank of Assistant Fire Chief without serving first as a Deputy Fire Chief, and that was in the Services branch of the Fire Department where the Battalion Chief promoted had been a direct subordinate of the Assistant Fire Chief. All of the individuals selected for the AFCO position had been, in the past, selected from the rank of Deputy Fire Chief.

At the time of the promotion decision in August 1974, four of the appellants, Bishopp, Stickley, Zeis and Breen, were serving at Deputy Fire Chief rank. Yocum was a Battalion Fire Chief. Jefferson Lewis, eventually selected to fill the AFCO position, was also a Battalion Fire Chief although he had not held that rank as long as had Yocum.

Responsibility for the selection of the new AFCO was shared by Fire Chief Burton Johnson and the Mayor, Walter Washington, both of whom are black. But it was undisputed that Fire Chief Johnson had de facto responsibility for the decision because the Mayor routinely adopted his recommendations. Applications to fill the vacant position were not sought, apparently because the Fire Department did not have a formal application process for the AFCO position. Instead, Chief Johnson prepared a list of "best qualified candidates" that included all of the appellants as well as Lewis. Chief Johnson selected Lewis, even though as the district court found, appellants were superior candidates to Lewis in terms of ordinary personnel criteria: "seniority, education, breadth of

experience and the like." *Bishopp v. District of Columbia*, 602 F.Supp. 1401, 1408 (D.D.C.1985). Each of the appellants had longer service than Lewis and all except Yocum had attained higher rank than Lewis. Breen, Bishopp and Zeis "had taken courses in such relevant matters as fire engineering and nuclear safety; Lewis did not have comparable credits." *Id.* at 1407. All of the appellants except Yocum had served satisfactorily as Acting AFCO, whereas Lewis, as a Battalion Chief, did not serve as acting AFCO until Johnson decided to recommend his promotion.

After Lewis' selection, appellants filed a grievance with the Fire Department alleging racial discrimination and thereafter, in the autumn of 1974, filed charges with the EEOC. The EEOC issued findings in appellants' favor on February 25, 1982 and issued a right to sue [1] letter on November 18 of that year.

Shortly thereafter suit was filed in the district court. At trial, appellants introduced evidence of their relative qualifications vis-a-vis Lewis, and appellant Breen testified that Chief Johnson had admitted to Breen before the selection that Johnson was under pressure from the District's black community to promote Lewis. The district court also noted that the Fire Department was beginning to develop an affirmative action plan at that time. The court refused, however, to admit as evidence the District's affirmative action plan or to consider an alternative defense based on that plan, ruling that it was inconsistent with the District's assertion that race did not play a factor in the selection of Mr. Lewis.[2]

---

**1.** The district court considered but rejected appellee's argument that appellants' suit was barred by laches because appellants failed to bring suit during the lengthy delay in the EEOC's processing of their complaint. *Bishopp v. District of Columbia*, 602 F.Supp. 1401, 1404 (D.D.C.1985). Under the statute, appellants could have brought suit before receiving their right to sue notice because the EEOC's delay in issuing the notice or otherwise acting on the charges exceeded 180 days. 42 U.S.C. § 2000e–5(f)(1) (1982). The district court applied the standards of *Rozen v. District of Columbia*, 702 F.2d 1202 (D.C.Cir.1983), and determined that

since appellants were proceeding pro se before the EEOC and they testified that they did not know they could sue before the EEOC issued the notice, their delay was not unreasonable. The court further stated that even if the delay were unreasonable, the District had not suffered substantial and material prejudice. 602 F.Supp. at 1404. We agree with the district court's resolution of the laches issue under the standard set forth in *Rozen*.

**2.** That ruling is not at issue in this appeal.

Former Fire Chief Johnson testified as to why he had chosen Lewis over the appellants: Bishopp and Stickley were too indecisive (Johnson could not recall any specific examples supporting his conclusions based on observations made ten or more years earlier). Zeis and Yocum were unsuitable because during the period they were responsible for the Fire Department's training facility Johnson recalled unofficial complaints concerning excessive black failure rates (the district court found that "[e]xhibits produced at trial do not document the [allegedly high] failure rate among blacks," 602 F.Supp. at 1407; the evidence tended to show that it was under three percent for all trainees). Finally, Johnson rejected Breen, the Fire Marshal, because he was doing too good a job, and he wished to keep him in that position. (Johnson acknowledged that Breen had a capable assistant who later did replace Breen).

Johnson's affirmative reasons for selecting Lewis did not relate to his personal experience with Lewis; they had not worked together for over twenty years. Rather, Johnson testified he wanted Lewis because the panel that had recommended Johnson as Fire Chief eighteen months earlier had ranked Lewis third among the candidates. Johnson was, however, unaware of the criteria utilized by that panel and Johnson did not list as a candidate for selection Jack Webb, a white male who had been ranked second by that same 1973 panel. According to Johnson, Webb, who was the Battalion Chief in charge of the Fire Department's Ambulance Service, was, like Breen, too valuable in that position to promote. This reason for selecting Lewis—his

number three ranking by the 1973 panel—was offered by Johnson for the first time at trial; he had not mentioned this justification to the EEOC or in deposition, and was unable to explain to the court why he had not raised this point before.

The district court held that the appellants had presented a prima facie case under *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), although it had just barely met its burden as to one prong of the prima facie case: showing " 'background circumstances' " that " 'support the suspicion that the defendant is that unusual employer who discriminates against the majority.' " 602 F.Supp. at 1406 (quoting *Parker v. Baltimore & O.R.R.,* 652 F.2d 1012, 1017 (D.C.Cir.1981) ). To satisfy this prong, the district court relied in part on evidence that an affirmative action plan was under consideration in the Department in 1974 (the department was "drafting if not adopting" such a program),[3] and in part on the District's failure to contest the existence of this aspect of this prima facie case.

Having concluded that appellants had met their burden of presenting a prima facie case, the district court turned to the District's justification, which the court fully credited. Noting that the District was not required to consider only the candidates' objective qualifications, the court held that the preponderance of the evidence supported Johnson's reasons for rejecting appellants and selecting Lewis. In the process of so reasoning the district court con-

---

**3.** *Cf. Lanphear v. Prokop,* 703 F.2d 1311 (D.C. Cir.1983) (affirmative action plan in development stage deemed a factor in establishment of prima facie case). The issue is not squarely before us, but we note that it is not clear whether a lawful, promulgated affirmative action plan can nonetheless provide a link in a prima facie case that would justify the inference of discrimination. *See Parker v. Baltimore & O. R.R.,* 652 F.2d 1012, 1017 n. 9 (D.C.Cir.1981) (dictum) (declining to suggest that lawful affirmative action plan "in itself" constitutes "suspicious circumstances" sufficient to justify inference of discriminatory intent). Although the Supreme

Court has yet to speak definitively on the lawfulness of government-adopted affirmative action plans, *see Wygant v. Jackson Bd. of Education,* 746 F.2d 1152 (6th Cir.1984), *cert. granted,* ——— U.S. ———, 105 S.Ct. 2015–16, 85 L.Ed.2d 298 (1985), it has upheld the validity of an affirmative action plan in the private sector. *See United Steelworkers v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979). But the Court has not yet explored the interrelationship between affirmative action plans and establishment of a prima facie case in a suit by a non-beneficiary of the plan.

cluded that complaints emanating from the training facility about Zeis and Yocum were nondiscriminatory grounds for rejecting both of them even though the District's own statistics revealed no basis for the complaints; that Breen, and, inferentially, Webb[4] might have a legitimate complaint for being passed over because they were too good—but not one based on Title VII; and that Breen's testimony concerning Johnson's admission that he was under pressure from the black community to promote Lewis was "flatly denied" by Johnson notwithstanding that Johnson, who testified after Breen, was not ever asked about that alleged conversation.

## II

The Supreme Court repeatedly has found it necessary to correct the courts of appeals' encroachment into the province of the district courts in Title VII cases. In *Burdine* the Court held that the Fifth Circuit erred by insisting that the district court require the defendant to assume the burden of proof as to nondiscriminatory motivation. 450 U.S. at 256–58, 101 S.Ct. at 1095–96. In *Pullman-Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982), the Court made clear that discriminatory motivation, although it is the ultimate issue in Title VII cases, is still a question of fact governed by the clearly erroneous standard of review prescribed in Rule 52(a) of the Federal Rules of Civil Procedure. 456 U.S. at 289–90, 102 S.Ct. at 1790–91. And just last year in *Anderson v. Bessemer City,* — U.S. —, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), the Court carefully delineated the bounds of the clearly erroneous standard of review as it applies to Title VII cases. The Supreme Court's direction to the courts of appeals was:

> If the district court's *account of the evidence is plausible in light of the record viewed in its entirety,* the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact it would have weighed the

evidence differently. Where there are *two permissible views of the evidence,* the factfinder's choice between them cannot be clearly erroneous.

*Id.* 105 S.Ct. at 1511–12 (citations omitted; emphasis added). The Court further directly focused on appellate court treatment of findings of fact based on credibility determinations.

> When findings are based on determinations regarding the *credibility of witnesses,* Rule 52 demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said. This is not to suggest that the trial judge may insulate his findings from review by denominating them credibility determinations, for factors other than demeanor and inflection go into the decision whether or not to believe a witness. Documents or objective evidence may contradict the witness' story; *or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it.* Where such factors are present, the court of appeals may well find clear error even in a *finding purportedly based on a credibility determination.* But when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, *each of whom has told a coherent and facially plausible story* that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.

*Id.* at 1512–13 (citations omitted; emphasis added).

Clearly then, we may not reverse the district court's acceptance of the District of Columbia's reasons for promoting Lewis and rejecting the appellants merely because we believe that the appellants' account of the evidence is more reasonable or even considerably more reasonable. We

---

4. Chief Webb was not a plaintiff in this suit.

must, if we are to reverse the district court, have reached the conclusion that its finding is unacceptable because it is based on an utterly implausible account of the evidence. Moreover, we must be particularly careful to defer to the district court's credibility findings unless the judge below credited a witness whose testimony was so internally inconsistent or implausible on its face that a reasonable factfinder could not credit it. Concededly, it is the rare case that should be reversed under this very restricted scope of review, but we are obliged to conclude that the judgment here meets that test.

### III

■ No longer can it be questioned that whites as well as minorities are protected by Title VII. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976). We have said that a white male plaintiff must present some evidence of "background circumstances" that give rise to an inference of discrimination (in light of the majority position of whites in the United States), *Lanphear*, 703 F.2d at 1315, in place of a black plaintiff's showing of minority status. The aim in both cases is to determine whether the plaintiff was "rejected under circumstances which give rise to an inference of unlawful discrimination." *Burdine*, 450 U.S. at 253–54, 101 S.Ct. at 1093–94. Under Title VII law, a member of a minority may adequately demonstrate such circumstances simply by

showing membership in a minority group. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. This difference flows quite naturally from what the Supreme Court has discerned as Congress' objective in enacting Title VII: the removal of barriers in employment opportunities to members of minority groups, which barriers "have fostered racially stratified job environments to the disadvantage of minority citizens." *Id.* at 800, 93 S.Ct. at 1823. A plaintiff's minority status by itself is sufficient in light of historical practice in the workplace toward such "socially disfavored group[s]," *Parker*, 652 F.2d at 1017, to give rise to an inference of discriminatory motivation. White males, who as a group historically have not been hindered in the workplace because of their race or sex, are required to offer other particularized evidence, apart from their race and sex, that suggests some reason why an employer might discriminate against them.[5]

■ Here appellants easily met that test; they presented a strong affirmative case of discrimination which included both circumstantial and direct evidence.[6] Lewis, after all, was promoted over the heads of four of the appellants in an unprecedented fashion. It is undisputed and the district court found that all of appellants were better qualified than Lewis if one considers only traditional, objective criteria usually employed in personnel decisions. To be sure, the district court was correct in concluding that the District of Columbia was not

5. Of course whites are in the minority in the District of Columbia but neither this court nor the Supreme Court has squarely addressed the issue whether minority status for purposes of a prima facie case could have a regional or local meaning. *Cf. Daye v. Harris*, 655 F.2d 258, 262 n. 11 (D.C.Cir.1981) (suggesting treatment of white nurse employed at St. Elizabeth's Hospital in Washington, D.C. as a member of a majority for purposes of a prima facie case).

6. The concurring opinion objects to this discussion of the affirmative evidence of discrimination as unnecessary, but in light of *Anderson*, it is no longer clear that courts of appeals may review a district court's opinion without looking at all the evidence of record. *Anderson*, after all, directs us to review "the record ... in its entirety." *Anderson*, 105 S.Ct. at 1511–12 (cita-

tion omitted). We do no more than that. Nothing in this opinion purports to decide a question not before us, *i.e.*, whether appellants' affirmative evidence made out a prima facie case as a matter of law. *See Burdine*, 450 U.S. at 255 n. 10, 101 S.Ct. at 1095 n. 10 (although presumption to which prima facie case gives rise disappears from case when defendant asserts nondiscriminatory reason for action, evidence used to establish prima facie case remains before court at ultimate burden stage). To be sure, our evaluation of the affirmative evidence cannot help but influence future Title VII cases including, perhaps, the question of what kind of evidence constitutes a prima facie case. Still, that is hardly grounds for avoiding analysis that the Supreme Court appears to require.

obliged, as a matter of law, to utilize *only* these objective criteria, but it is quite another thing to conclude, as the district court apparently did, that appellants' superiority on these factors is irrelevant to the issue of defendant's motivation. *See Burdine*, 450 U.S. at 259, 101 S.Ct. at 1096. Indeed, we have held that a defendant's reliance on subjective as opposed to objective factors requires a court to employ heightened scrutiny. *Davis v. Califano*, 613 F.2d 957, 965–66 (D.C.Cir.1979).

The district court seemed to have had unwarranted difficulty in finding evidence tending to support the proposition that the Fire Department and the District had reason to prefer a black over a white for the AFCO post. The court held that the fact that both the Mayor and Fire Chief were black was *by itself* not probative evidence of discrimination. Surely it would not be conclusive evidence or perhaps even strong evidence of discriminatory motivation but again it could hardly be, as the trial court treated it, *irrelevant,* particularly since it did not stand by itself.[7] Two other related pieces of evidence support a conclusion that the District wished to promote Lewis at least in part because he is black. First, there was the affirmative action plan of 1974 which "the fire department was draft-

ing if not adopting" upon which the district court relied. 602 F.Supp. at 1406. Second, and more significant, there was unrebutted evidence of political pressure on the District to promote Lewis because of his race.[8] The court, as we have noted, rejected the evidence of political pressure, finding that Chief Johnson "flatly denied" Breen's testimony as to Johnson's admission that such pressure existed. If Johnson *had* so testified, in light of *Anderson,* discussed above, we would have no choice but to defer to the district court's finding of credibility—but since Johnson was not even asked about Breen's testimony, it actually stands unrebutted. The district court could also have found that Breen's uncorroborated testimony was not by itself credible, without reference to Johnson's testimony. We would likely decline to overturn such a finding because a district court may legitimately refuse to credit uncorroborated testimony by an interested witness. *See Guzman v. Pichirilo,* 369 U.S. 698, 702–03, 82 S.Ct. 1095, 1097–98, 8 L.Ed.2d 205 (1962). But it is clear from the district court's opinion that it declined to credit Breen's testimony based in large part on its understanding that Johnson's testimony had contained a competing version of the conversation, namely that it had never occurred—that Johnson "flatly denied" it.[9] Appellants ar-

---

7. In *Plummer v. Bolger,* 559 F.Supp. 324 (D.D.C.), *aff'd without opinion,* 721 F.2d 1424 (D.C. Cir.1983), which the court cited in support of its conclusion on this point, the district court held that a white male plaintiff failed to make out a prima facie case of discrimination merely by showing "that all of his immediate supervisors were black." 559 F.Supp. at 329. The *Plummer* court stated that "[w]ithout more … that fact is not sufficient to show that defendant is 'that unusual employer who discriminates against the majority.'" *Id.* (quoting *Parker,* 652 F.2d at 1017–18). Thus, *Plummer* is easily distinguished from the case now before us because Mayor Washington's and Chief Johnson's race do not stand alone as the only evidence of "background circumstances."

8. Surely it could not be successfully argued that discrimination otherwise prohibited under Title VII is lawful if predicated on the political considerations that once strongly influenced the distribution of public jobs among ethnic, religious, and racial groups in American cities. Acceptance of that approach could destroy the effectiveness of Title VII for those most in need

of protection against discrimination in employment.

9. Regarding this conversation, the district court stated:

> The *only* evidence of pressure on Johnson came out through the testimony of plaintiff Breen, who stated that Johnson had admitted to him before the promotion that he faced pressure to choose Lewis because of his race. No witness corroborated that testimony, and Johnson flatly denied it. Breen's allegation was made for the first time at trial, and he gave no convincing explanation for his failure to bring Johnson's alleged admission to light at an earlier stage of the proceedings. Moreover, Breen's testimony conflicts with his earlier statement to the EEOC that he first learned of the Lewis promotion through newspaper accounts after the fact. Under these circumstances, Chief Johnson's version is the more credible.

602 F.Supp. at 1408–09. It is, of course, not surprising that Breen's account of the conversation received no corroboration. Breen and

gue, and our own examination of the record confirms, however, that there was no such conflict in the testimony on this point. Johnson was never asked any questions about the conversation and he never discussed it in any of the proceedings related to this case. Johnson did state at one point in his testimony that race was not a factor in his decision, but that conclusory statement—surely the minimum necessary for the District's defense—does not address the point at issue here.

Finally, the district court emphasized that subsequent appointments that Fire Chief Johnson made to fill vacancies in the Assistant Chief—Services post went to whites which, therefore, indicated that the District was not racially motivated. But, of course, if the District's motivation in promoting Lewis was based on racial preference it matters not if subsequent appointments were made without discriminatory motivation. Moreover, if one were to take the subsequent appointments into account, presumably one would bear in mind (as the district court did not) that they were made after appellants filed their charges with the EEOC.[10]

■■■ With that background in mind, our analysis shifts to the District's defense of its promotion decision. A defense in a Title VII promotion case characteristically has two parts: the first, an explanation why the complainant was rejected and the second, an explanation why the selectee was chosen. Cf. Burdine, 450 U.S. at 254, 101 S.Ct. at 1094. In this case both parts of the District's defense strike us as incredible. Bishopp and Stickley were turned down as indecisive because of vague ten-year-old images in Johnson's memory untied to any facts. Zeis and Yocum were rejected based on unfounded complaints about their inadequacy in supervising the training facility—complaints which themselves suggest a racial motive for rejecting them. Finally, most farfetched, Breen was disqualified and Webb was not even considered for promotion because they were too good in their present jobs.

Turning to the other side of the decision, why Lewis? Johnson told the court he selected Lewis because he ranked third in a Fire Chief selection panel a year-and-a-half earlier. That explanation might be credible if Johnson knew something about the criteria utilized by the panel or was familiar with Lewis' performance.[11] By his own candid admission, however, Johnson had little or no direct knowledge as to either of those subjects. Moreover, Johnson's explanation is internally inconsistent since Webb, who was ranked higher by the same selection panel, was rejected *ab initio* as a candidate for the AFCO position because he also was too competent at his existing job. This weak and self-contradictory explanation was first offered not before the

---

Johnson were the only two present, and as noted, Johnson was never asked about the conversation. Moreover, we totally fail to see the inconsistency between Breen's testimony that on the one hand, he learned of the promotion decision through the newspapers and that, on the other hand, *prior* to the decision Johnson admitted to Breen that Johnson was under political pressure to promote Lewis.

10. *See Rich v. Martin Marietta Corp.*, 522 F.2d 333, 346 & n. 11 (10th Cir.1975) (statistics showing company's improved employment practices towards minorities in period following filing of EEOC charges not relevant to pre-charge Title VII liability, but might be relevant to formulation of remedy); *Parham v. Southwestern Bell Tel. Co.*, 433 F.2d 421, 425 (8th Cir.1970) (post-charge employment practices not relevant to pre-charge practices and issue of Title VII violation).

11. We cannot determine from this record the criteria utilized by the 1973 panel or even whether the District believed that the promotion to Fire Chief in 1973 was governed by Title VII. In fact, the District argued before the district court in this case that appellants were too high ranking to be considered "employees" for purposes of the Act. Presumably, then, those considered for selection to the Fire Chief position likewise were thought excluded from Title VII coverage. Certainly in 1973, well before *Hishon v. King & Spalding*, 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) (holding Title VII applies to selection for non-employee positions if consideration for that position can be regarded as one of "terms, conditions, or privileges of employment" of a covered job), that was a viable legal theory.

EEOC and not even in pretrial depositions but at trial.

Defendant's explanation for its decision was unworthy of credence as a matter of law. Such a blatantly pretextual defense carries the seeds of its own destruction. That is, it does not even satisfy the defendant's "intermediate burden" of producing "admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Burdine*, 450 U.S. at 257, 101 S.Ct. at 1096.

■ Even if we did not separately hold the appellee's defense pretextual as a matter of law, we would, in any event, reverse on the basis of the overall *Anderson* test, *i.e.*, combining all the evidence together, we conclude that the district court's finding of no discrimination is clearly erroneous. In other words, having reviewed the record in its entirety as *Anderson* requires, *see supra* note 6, we are unable to conclude that the district court's account of the evidence is plausible. We are thus obliged to overturn the district court's decision on the promotion claim. We remand the matter to the district court for further consideration, including the fashioning of an appropriate remedy.

## IV

■ Appellants' claims of retaliation and of constructive discharge in part overlap; they rely on certain of the same alleged facts, namely the several incidents in which Fire Department personnel allegedly demonstrated their hostility toward appellants because of their discrimination complaints. The district court's opinion catalogues several such incidents, 602 F.Supp. at 1409–10, including, for example, the following: (1) Yocum was laterally transferred in the fall of 1974. He had not requested the transfer, and no one had consulted him or his supervisor, Deputy Chief Zeis, about it. Similarly, in October 1977 Breen received a lateral transfer from the Fire Marshal position without having requested the new position. (2) In late 1974 Zeis was relieved of his duties as EEO officer. (3) None of the appellants received promotions to the Assistant Chief level after filing their EEOC complaints. Appellants argue that these incidents demonstrate appellee's reprisal and amount to circumstances so intolerable that they felt driven to leave the Fire Department.

The district court found, however, that there had been neither retaliation nor constructive discharge in this case. With regard to the retaliation claim, the court applied the pattern of proof for a prima facie case of retaliation set forth in *McKenna v. Weinberger*, 729 F.2d 783 (D.C.Cir.1984). *McKenna* requires plaintiffs to show "(1) that [they] engaged in a statutorily protected activity; (2) that the employer took an adverse personnel action; and (3) that a causal connection existed between the two." *Id.* at 790. The court determined that although appellants had shown that they were involved in protected activity, *i.e.*, the filing of EEOC complaints, it was "debatable" whether the incidents alleged amounted to adverse personnel actions or harassment within the meaning of *McKenna*. 602 F.Supp. at 1410. But the district court held that even if appellants *arguendo* demonstrated a prima facie case, the defendant had offered a "legitimate, non-discriminatory reason for each of its challenged actions, and plaintiffs have not punctured the credibility of defendant's explanations." *Id.* The district court found, for example, that Yocum's transfer was legitimate: "Given Johnson's doubts (whether well-founded or not) as to Yocum's contribution to the training program even *before* the Lewis promotion, it is not surprising that a transfer was ordered." *Id.* The court also stated that "[t]he 1977 Breen transfer was made for an equally legitimate reason—to place Breen where his skills were most needed." *Id.*

To the claim of constructive discharge, the district court applied the standard set forth in *Clark v. Marsh*, 665 F.2d 1168, 1173 (D.C.Cir.1981): " 'A finding of constructive discharge depends on whether the employer deliberately made working conditions intolerable and drove the employee

into 'an involuntary quit' " (citations omitted). A finding of constructive discharge requires a finding of intentional discrimination plus a finding of "aggravating factors" that suggest that the complainant was driven to quit. 665 F.2d at 1173–74. The district court declined to find constructive discharge in this case because "plaintiffs have proven neither discrimination nor [based on the same alleged incidents at issue in the retaliation claim] the existence of aggravating factors sufficient to support a finding of constructive discharge." 602 F.Supp. at 1411.

Although the retaliation and constructive discharge claims must be analyzed independently from the promotion claim, the interrelationship with the promotion claim is obvious. The constructive discharge claim in particular is linked to the promotion claim insofar as a finding of discrimination is a necessary predicate for a finding of constructive discharge.

In view of our conclusions on certain aspects of the promotion claim which are also implicated in the district court's disposition of the constructive discharge and retaliation claims, we vacate the district court's findings on constructive discharge and retaliation. We remand those matters to the district court with instructions to reconsider the constructive discharge and retaliation claims in light of our holding on the promotion claim.

*Reversed in part, vacated in part, and remanded*

WALD, Circuit Judge, concurring:

I concur in the panel's judgment and opinion with the exception of its discussion of plaintiffs' prima facie case. *See* Maj.Op. at 786–88. Defendants have not questioned the adequacy of plaintiffs' prima

facie case on appeal, and an appellate court normally does not concern itself with whether a prima facie case has been made once a Title VII case has gone through a trial on the merits. The *McDonnell Douglas-Burdine* presumptions drop out of the case once defendants have failed to prevail on a motion to dismiss at the close of plaintiff's case and have presented their reasons for the allegedly discriminatory action. *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 714–15, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983).[1] Even if this were one of the rare instances where post-trial consideration of the prima facie case was necessary, *see Cuddy v. Carmen,* 762 F.2d 119, 124 & n. 6 (D.C.Cir.1985), I believe the majority errs when it admonishes the District Court for "unwarranted difficulty" in finding a prima facie case. Maj.Op. at 787.

Nonminority Title VII plaintiffs, such as the ones here, must make the additional showing in their prima facie case that " 'background circumstances support the suspicion that the defendant is the unusual employer who discriminates against the majority'." *Lanphear v. Prokop,* 703 F.2d 1311, 1315 (D.C.Cir.1983) (footnote omitted). The majority finds that such a showing was made because the Fire Chief and Mayor were black, an affirmative action plan was being drafted and there was some additional evidence of political pressure to promote Lewis because of his race. The first factor *alone* cannot support a finding of sufficient background circumstances, as the majority concedes. Maj.Op. at 787; *Plummer v. Bolger,* 559 F.Supp. 324, 329 (D.D.C.), *aff'd without opinion,* 721 F.2d 1424 (D.C.Cir.1983). I question as well the weight of the other two grounds on which the majority primarily relies for its conclusion that plaintiffs presented a "strong af-

---

1. The majority correctly notes that evidence introduced as part of the prima facie case can be considered after the presumptions drop out in order to assess whether discrimination has been shown on the record as a whole. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 255 n. 10, 101 S.Ct. 1089, 1095 n. 10, 67 L.Ed.2d 207 (1981). But there is nothing in *Burdine* to suggest that, at the end of the case, that evidence needs to be reassessed to see whether a prima facie case was made out. *Burdine* says quite the contrary. The only function I see in the majority's evaluation of the evidence in terms of prima facie standards is to lay down guidelines for future plaintiffs in reverse discrimination Title VII suits, a function I consider to be inappropriate and unnecessary in this appeal.

firmative" prima facie case of discrimination. Maj.Op. at 786.

This court has squarely stated that "a lawful affirmative action program [cannot] in itself constitute suspicious circumstances sufficient to justify an inference of discriminatory intent under *McDonnell Douglas.*" *Parker v. Baltimore & Ohio Railroad,* 652 F.2d 1012, 1017 n. 9 (D.C.Cir.1981). We have, however, on occasion permitted consideration of a *proposed* plan as evidence of political pressure to discriminate. *Lanphear,* 703 F.2d at 1315. Like the race of the hiring official, however, a proposed plan should not be viewed as strong evidence of discrimination. *Cf.* Maj.Op. at 787. Indeed, it is counter-intuitive to do so. Routinely treating proposed affirmative action plans as evidence of discrimination poses a real risk of discouraging the consideration or adoption of lawful affirmative action programs. As the Seventh Circuit explained in adopting this court's reasoning in *Parker,* "[n]ational policy permits the use of voluntary affirmative action programs to remedy the legacy of discrimination. For the courts to discourage the use of such programs by treating them as evidence in themselves of the very discrimination they are designed to eradicate would be improper." *Christensen v. Equitable Life Assurance Society,* 767 F.2d 340, 343 (7th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 885, 88 L.Ed.2d 920 (1986). At best, therefore, the affirmative action plan under consideration at the fire department should be viewed as the weakest sort of evidence of political pressure to discriminate.

I further disagree with the majority about the strength of the additional evidence of political pressure in the form of testimony by plaintiff Breen that Chief Johnson had told him that he, Johnson, was under pressure to promote Lewis because of his race. Maj.Op. at 787–88. The District Court rejected Breen's testimony for several reasons. Only one—that Chief Johnson flatly denied making the statement—was clearly erroneous. I disagree with the majority's conclusion that the District Court declined to credit Breen's testi-

mony *primarily* because of that erroneous finding. The District Court actually cited three other reasons for failing to credit Breen's testimony of political pressure: (1) it was uncorroborated; (2) it was made for the first time at trial, with no explanation of why it was not mentioned to the EEOC; and (3) it was inconsistent with his statement that he first learned of the Lewis promotion through the newspapers. *Bishopp v. District of Columbia,* 602 F.Supp. 1401, 1408–09 (D.D.C.1985). As the majority acknowledges, Maj.Op. at 787, a district court may legitimately refuse to credit uncorroborated testimony by an interested witness, *Guzman v. Pichirilo,* 369 U.S. 698, 702, 82 S.Ct. 1095, 1097, 8 L.Ed.2d 205 (1962), and the Supreme Court has recently cautioned that a district court's credibility determination "can virtually never be clear error," *Anderson v. City of Bessemer City, North Carolina,* —— U.S. ——, 105 S.Ct. 1504, 1513, 84 L.Ed.2d 518 (1985). Given the deference due to district court credibility determinations under *Anderson,* I find it appropriate to read the District Court's opinion as rejecting Breen's testimony even in the absence of countervailing testimony by Chief Johnson.

Thus, the only evidence of "background circumstances" is the fact that the Mayor and the Fire Chief were black and that a draft affirmative action plan was in the works, both of which are weak evidence and neither of which could alone support a finding of suspicious background circumstances. In finding that a prima facie case had been made out, the District Court relied heavily on the defendants' concession that plaintiffs were qualified and belonged to a protected group. 602 F.Supp. at 1406; *see* Transcript at 368. Although defendants briefly argued the lack of "background circumstances" in their motion to dismiss, Transcript at 370–72, they never challenged the use of the affirmative action plan as evidence in that motion, their posttrial filings, or before this court. Thus, I agree with the District Court that the defendants' concession that background circumstances existed is really all that raises

plaintiffs' relatively weak evidence of discrimination to the level of a prima facie case. I therefore decline to concur in the majority's dicta about the strength of plaintiffs' prima facie case.

I concur in the judgment, however, because I agree that the pretextual nature of the defendants' "nondiscriminatory" justification is clear and that the overall record supports a verdict for the plaintiffs. I feel it necessary, however, to point out my doubts about the alleged "strength" of prima facie case based in large part on an affirmative action proposal and the race of the hiring officials because of my concern that, in future cases where these issues are raised, prima facie showings of a similarly weak nature will be upheld or, worse still, characterized as strong.