Betty F. UNDERWOOD, Appellant,

v.

DISTRICT OF COLUMBIA ARMORY BOARD, et al.

No. 85–6095.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 26, 1987.

Decided April 24, 1987.

Robert B. Fitzpatrick, for appellant.

Edward E. Schwab, Asst. Corp. Counsel, District of Columbia, with whom John H. Suda, Acting Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, were on the brief, for appellees.

Before WALD, Chief Judge, STARR, Circuit Judge and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Chief Judge WALD.

WALD, Chief Judge:

Appellant Betty F. Underwood, an employee of the District of Columbia Armory Board ("Board"), alleges that appellees' failure to promote her to various positions with the Board between December, 1981 and May, 1983 constituted employment discrimination based on race and sex, in violation of 42 U.S.C. § 1981, 42 U.S.C. § 1983, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Underwood also alleges that certain actions taken by appellees after she filed this lawsuit constituted unlawful retaliation, in violation of Title VII and 42 U.S.C. § 1985(2). After a five-day non-jury trial, the District Court rejected Underwood's discrimination and retaliation claims. *See* 38 Fair Empl. Prac.Cas. (BNA) 1713, 1721 (D.D.C.1985). We affirm the District Court with respect to all of Underwood's claims, with the exception of her claim of racial discrimination in the December, 1981 selection of the acting armory manager, which we remand for further consideration.

## I. BACKGROUND

### A. *The Facts*

During the period when the personnel decisions at issue were made, Underwood was employed as an administrator under the supervision of Robert Sigholtz, the general manager of the Armory Board. As general manager, Sigholtz was responsible for the day-to-day operation of the stadium-armory complex and made all personnel decisions with respect to Board employees, including all of the decisions challenged in this action. Before he was hired as general manager in 1973, Sigholtz had been the athletic director of Georgetown University, where Underwood was employed as secretary to the athletic department. Underwood left Georgetown shortly after Sigholtz did. After becoming general manager, Sigholtz was authorized by the Board to hire a secretary, and he selected Underwood as his administrative assistant. Underwood testified that she had "more respect for Mr. Sigholtz than I did anyone in the world at that time," and that she accepted the position at the Armory Board because Sigholtz had gone there. Trial Transcript ("Tr.") at 584. Sigholtz and other witnesses described Underwood as Sigholtz' "right arm," Tr. at 206, 354, and stated that members of the Board and other city officials frequently dealt directly with Underwood on matters concerning the stadium-armory complex. Tr. at 206, 470. Sigholtz conceded that he had delegated much of his responsibility to Underwood, and that he did "very little" in his position as general manager. Tr. at 469–70.

The position of armory manager became vacant when Kenneth Hopkins announced his retirement in November, 1981. Hopkins submitted a memorandum to Sigholtz, dated November 19, 1981, in which he recommended that his secretary, Mary Wilhoite, be selected to fill the vacancy. Wilhoite, a black woman, was then employed in a grade 7 secretarial position and also served as the armory box office manager. Sigholtz met with Wilhoite, discussed the armory manager position with her, and requested that she apply for it. Effective December 31, 1981, Wilhoite was named acting armory manager, but she received no grade or salary increase at that time.

Sigholtz testified that he did not consider Wilhoite qualified for the position at the time he appointed her. Tr. at 337. Wilhoite herself testified that she did not meet the qualifications stated in the announcement of the armory manager position, and that she applied for the position because Sigholtz asked her to do so. Tr. at 164–65, 167. Sigholtz stated that he selected Wilhoite to be acting armory manager "because she was black," Tr. at 340, and because City Administrator Elijah Rogers ordered him in a telephone conversation to "hire a black for the position." Tr. at 335–36. According to Sigholtz, Rogers was responding to a discrimination claim brought by another black employee of the Armory Board, Willis Johnson, who had been fired by Sigholtz. Johnson had served as armory manager for several years. Six months before his discharge, which took place in December, 1980, Johnson was transferred to the stadium manager position. Following his dismissal, Johnson filed a charge of race discrimination with the District of Columbia Office of Human Rights. The City Administrator found probable cause to believe that there had been discrimination, and, on July 22, 1981, ordered that Johnson be reinstated with back pay, that he be transferred to another city agency, and that the Board "fill the position ... to be vacated by [Johnson], upon reassignment, with a qualified minority employee." Plaintiff's Exhibit 15; Defendants' Exhibit B. Sigholtz testified that he considered Rogers' directive to apply to either the armory manager or stadium manager position, Tr. at 336, and that he concluded that "since I got this directive from Elijah Rogers, I had no alternative [but] to put a black in there. And [Wilhoite] was a double minority, so I felt as if I would be in good standing with the Board." Tr. at 340.

In January, 1982, Underwood applied for the permanent armory manager position, which remained open after Wilhoite's appointment as acting manager. Steven Murphy, the Board's concessions manager, also

applied for the position. In early 1982, Board personnel consultant Wilmer Gilmore suggested to Sigholtz that a rotation plan be adopted, under which Wilhoite, Underwood, and Murphy would each serve as acting armory manager for three months, after which one of the three would be selected for the permanent position. While this plan was being considered, James Magarity, the stadium superintendent and acting stadium manager, announced that he planned to retire in May, 1982. The rotation plan was then abandoned, and Murphy was promoted to special assistant to the general manager. His primary duty in that position was to serve as acting stadium manager, in order to fill the vacancy left by Magarity's retirement. Sigholtz conceded that the qualifications for the special assistant position were "tailormade that Mr. Murphy would qualify." Tr. at 353. Underwood did not possess the required qualifications and did not submit an application for the position. Sigholtz testified that he did not appoint Underwood to the special assistant position because "she was too busy with her other tasks" and that he did not recommend her for "upward mobility" because "if there was a problem, I felt very comfortable giving it to Mrs. Underwood and she would solve the problem. And she was like a right arm to me, and I would hate like heck to lose her." Tr. at 353–54, 437.

Wilhoite and Underwood also received promotions in the spring of 1982. Effective March 21, Wilhoite was promoted to armory management assistant, a grade 9 position. She continued to perform the duties of acting armory manager. Underwood's position was upgraded to administrative officer, and she was also given an increase in salary.

Sigholtz was dissatisfied with Wilhoite's performance as acting armory manager, and he proposed at a Board meeting in December, 1982, that Wilhoite be relieved of her duties as acting manager and permanently assigned to the position of armory management assistant, so that a new armory manager could be selected. No action was taken on Sigholtz' proposal at the December meeting. When he raised the subject again at a meeting with two of the Board members in January, 1983, the proposal was "vetoed." Tr. at 344. The following month, Board member General Calvin Franklin sent a memorandum to Sigholtz, stating the Board's "strong recommendation" that Wilhoite and Murphy be upgraded from acting to permanent managers. Plaintiff's Exhibits 25a, 25b. Accordingly, Sigholtz appointed Wilhoite and Murphy as permanent managers of the armory and stadium, respectively, effective February 20, 1983. Wilhoite's position as armory manager was designated as a grade 11 position until September, 1983, when she was promoted to a grade 13.

Murphy resigned shortly after he was promoted, and beginning in March, 1983, applications were solicited for the positions of stadium manager and stadium management assistant. Underwood applied for both positions. Gilmore and Robert Downey, the Board's industrial relations manager, screened the applications for the stadium manager position and rated the applicants as "well qualified," "qualified," or "unqualified." Underwood was one of seven out of the sixty-six applicants for the position who were rated as "well qualified." Downey recommended William Barnhill, with whom Sigholtz was already acquainted, as the best qualified applicant. Barnhill was then employed as assistant general manager of Giant Stadium in Meadowlands, New Jersey and had a graduate degree in sports and facility management. Barnhill was the only candidate to be interviewed and was hired as stadium manager, effective May 9, 1983. Underwood testified that after Barnhill was selected, she asked Sigholtz why she had not been considered for the position of stadium manager, and he responded that "it was a man's job." Tr. at 609.

Gilmore and Downey also screened the applications for the stadium management assistant position and recommended to Sigholtz that one of the applicants be hired. That applicant was rejected by Sigholtz, however, because his references were unfavorable. Sigholtz then decided to wait to fill the position until Barnhill began work-

ing, so that Barnhill could have input into the selection process. After Barnhill became stadium manager, he interviewed nine candidates for the assistant position and recommended one of them to Sigholtz. Barnhill testified that he did not interview Underwood because he considered her unqualified for the position due to her lack of prior experience in managing a stadium facility and her lack of the required educational background. Tr. at 250, 255–56, 258. No further action was taken with respect to the stadium management assistant position, and the position was never filled. Sigholtz fired Barnhill in May, 1984, shortly before the end of his one-year probationary period. No one was hired to replace Barnhill as stadium manager. Underwood filed this action on September 27, 1983. Until that time, she had been recording secretary to the Board and had attended Board meetings and kept minutes of those meetings. In November, 1983, shortly before the first Board meeting to be held since her lawsuit was filed, Underwood was informed that she would no longer be serving as recording secretary. She was replaced in that position by another Board employee. Also in 1983, soon after this action was commenced, a desk audit of Underwood's duties was performed, outside of the regularly scheduled biannual review of all Armory Board positions. After the audit was completed, Underwood's job description was amended to eliminate certain responsibilities.

## B. *The District Court's Decision*

After a five-day trial, the District Court rejected Underwood's discrimination and retaliation claims.[1] The court held that Sigholtz' failure to promote Underwood was not prompted by a discriminatory mo-

tive. Rather, the court concluded, Sigholtz was motivated by a desire to retain Underwood as his assistant, in which capacity, the court found, Underwood performed "the lion's share" of the work associated with his position as well as her own. 38 Fair Empl.Prac.Cas. at 1719.

The court first considered Underwood's claim that the selection of Wilhoite to be acting armory manager in December, 1981, and her eventual promotion to armory manager in 1983 resulted from an impermissible decision to place a black employee in the armory manager position in response to the controversy surrounding the firing of Willis Johnson. The court noted that the written directive from City Administrator Rogers required that the position be filled by a "minority," not necessarily a black, and that Sigholtz characterized Wilhoite as a "double minority," so that "[i]t is clear that Sigholtz understood the term 'minority' to include women." *Id.* Further, the fact that Sigholtz considered instituting a rotation plan under which Murphy, a white male, would rotate with Wilhoite and Underwood as acting armory manager, was evidence that "Sigholtz no longer viewed Rogers' directive as determinative (if he ever had)." *Id.* The court concluded that even if Sigholtz appointed Wilhoite to be acting armory manager because of her race, "he did so before plaintiff had submitted her name to be considered for permanent armory manager. Thus, plaintiff was not yet in a position to be affected by the decision." *Id.*

Next, the District Court considered Underwood's claims that Sigholtz' failure to promote her to the positions of special assistant to the general manager (which included the duties of acting stadium manag-

1. The court also held that a three-year statute of limitations applied to Underwood's claims brought under 42 U.S.C. §§ 1981 and 1983, and accordingly concluded that all of her claims were timely filed. 38 Fair Empl.Prac.Cas. at 717–18. After the District Court's opinion was issued, this court held that "the three-year statute of limitations applicable to personal injuries suits controls actions brought under § 1981 in the District of Columbia." *Banks v. C & P Telephone Co.,* 802 F.2d 1416, 1417 (D.C.Cir. 1986). At oral argument in this case, counsel

for appellees stated that in their view, the decision in *Banks* would also apply to actions brought under § 1983, and that therefore the question of whether Underwood's claims were timely filed was no longer in dispute. Accordingly, Underwood's motion to strike the portion of appellees' brief concerning the applicable statute of limitations is denied as moot. For purposes of this case, we assume, without deciding the issue, that the three-year statute of limitations applied to Underwood's claims under § 1983, as well as those under § 1981.

er) and stadium manager resulted from unlawful sex discrimination. The court concluded that Sigholtz did not select Underwood for the special assistant position because he wanted her to continue to serve as his "right hand." Accordingly, Sigholtz' decisions to name Murphy as the special assistant in charge of managing the stadium, to keep Wilhoite in a management position at the armory, and to "mollif[y] plaintiff, his indispensable associate, with a raise and an upgraded title ... make sense not as acts of discrimination but as acts of self-protection on Sigholtz' part." *Id.* Further, the court concluded, the decision to promote Murphy and Wilhoite from acting to permanent managers in February, 1983 "was an appropriate ... and nondiscriminatory effort by the Board to stabilize both facilities and improve morale." *Id.* at 1720.

The court also rejected Underwood's claim that the selection of Barnhill as stadium manager in May, 1983 was based on sex. The court noted that Barnhill was the most qualified candidate with respect to both education and experience. It concluded that Sigholtz' statement to Underwood that stadium management was "a man's job" was "an excuse rather than the true reason for plaintiff's nonselection":

> Since long before the Barnhill promotion, Sigholtz, dependent on plaintiff's undeniable general competence, had considered plaintiff indispensable—his "right arm" —and *for that reason* he repeatedly ignored opportunities to promote her into management. The Barnhill incident fits the pattern. Oddly enough, in this case the admission of discrimination is the pretext, and the true reason for Sigholtz' treatment of plaintiff, however unfair, is not prohibited by statute.

*Id.* (emphasis in original).

With respect to the stadium management assistant position, the court stated that because the position was never filled, it was "doubtful" that Underwood could make a prima facie showing of discrimination. The District Court concluded that even if Underwood could make out a prima facie case, she would be unable to prevail. Because the stadium had lost all of its tenants with the exception of the Washington Redskins, "the nonselection of plaintiff—or any other candidate—as stadium manager assistant was a sound and wholly nondiscriminatory business decision." *Id.*

Finally, the District Court rejected Underwood's retaliation claims, concluding that "the totality of the evidence demonstrates that defendants' actions were legitimate." *Id.* at 1721. The court stated that the Board's concern that its discussions of personnel matters not be inhibited by Underwood's presence was a legitimate and nonretaliatory reason for its removal of Underwood from the position of recording secretary. Similarly, the 1983 desk audit and subsequent removal of certain of Underwood's duties were motivated by the Board's legitimate need to "clarify the scope of plaintiff's position" and to "delineate and consolidate the duties of their employees." *Id.*

## II. ANALYSIS

This court has recently reiterated the narrow scope of our review of District Court findings in Title VII cases. *Bishopp v. District of Columbia,* 788 F.2d 781 (D.C. Cir.1986). We may not reverse the District Court's determination that Underwood was not a victim of unlawful discrimination or retaliation

> merely because we believe that the [appellant's] account of the evidence is more reasonable or even considerably more reasonable. We must, if we are to reverse the district court, have reached the conclusion that its finding is unacceptable because it is based on an utterly implausible account of the evidence.

*Id.* at 785–86. The *Bishopp* court concluded that "it is the rare case that should be reversed under this very restricted scope of review." *Id.* at 786. With this standard in mind, we consider the District Court's treatment of each of Underwood's claims.

### A. *The Armory Management Positions*

The District Court briefly discussed Underwood's claim that the selection of Wilhoite as acting armory manager was

the result of "an impermissible race-conscious decision to advance a black employee in the wake of the Willis Johnson controversy," 38 Fair Empl.Prac.Cas. at 1719, but the court did not make any definite finding with respect to this issue. Instead, the District Court concluded that even if Sigholtz' decision to appoint Wilhoite was racially motivated, Underwood was not adversely affected by that decision, because she had not applied for the permanent armory manager position before Wilhoite was selected as acting manager. This reasoning ignores the fact that the naming of Wilhoite as acting manager placed Underwood at a serious disadvantage in competing for the permanent position, especially since the Board, when it was made aware that Sigholtz considered Wilhoite's performance to be unsatisfactory, rejected his attempts to remove her. Moreover, it is clear that Underwood had no opportunity to apply for the *acting* manager position prior to Wilhoite's selection. We conclude that the District Court's finding that Underwood was not adversely affected by the appointment of Wilhoite as acting armory manager is clearly erroneous.

■ Because the District Court did not make an explicit determination as to Sigholtz' motivation in selecting Wilhoite as acting armory manager, we remand for findings on that issue. *See DeMedina v. Reinhardt*, 686 F.2d 997, 1011 (D.C.Cir. 1982) (district court in Title VII case must make specific findings of fact on all material issues raised by plaintiff's allegations). We note, however, the existence of considerable evidence that the appointment of Wilhoite was racially motivated. In its discussion of the Wilhoite appointment, the District Court appeared to overlook direct evidence of a discriminatory motive—namely, Sigholtz' unrefuted testimony that City Administrator Rogers directed him in a telephone call to hire a black to replace Johnson. The court did consider Rogers' written directive that a "minority employee" be hired to fill the position, but dismissed this evidence by noting that Sigholtz referred to Wilhoite as a "double minority," concluding that, if Sigholtz considered himself bound by Rogers' directive

at all, he felt obliged only to hire a "minority" (defined to include women), not necessarily a black. This conclusion, however, ignores Sigholtz' own repeated insistence that he felt compelled by Rogers' order to hire a black person; for example, in the sentence preceding Sigholtz' use of the phrase "double minority," he stated that "since I got this directive from Elijah Rogers, I had no alternative [but] to put a black in there." Tr. at 340. Sigholtz himself never indicated that he believed Rogers' directive would have been satisfied by the selection of a woman, or of anyone other than a black person.

Sigholtz' testimony that he selected Wilhoite "because she was black" is supported by clear evidence that Wilhoite was unqualified for the management position at the time she was named acting armory manager. Not only did Sigholtz testify that he considered Wilhoite unqualified at the time he appointed her, but Wilhoite herself agreed that she lacked the required qualifications for the armory manager position and applied for it only because Sigholtz requested her to do so.

The District Court apparently concluded that Sigholtz' actual motive for promoting Wilhoite rather than Underwood was his reluctance to give up Underwood as his "right hand" assistant. But even if we accept Sigholtz' anxiety about the prospect of losing Underwood, that fact still does not explain his seeking out the clearly unqualified Wilhoite in order to convince her to apply, nor does it explain Wilhoite's subsequent abrupt advancement from a grade 7 secretarial position to a grade 13 management position in a period of less than two years. Neither does the evidence that Sigholtz at one point considered a rotation plan for the acting armory manager position serve to rebut Sigholtz' testimony that he hired Wilhoite because of her race. The idea of adopting a rotation plan arose only after Sigholtz became dissatisfied with Wilhoite's performance, *see* Tr. at 339, and the fact that Sigholtz subsequently considered such a plan sheds no light on Sigholtz'

motive for seeking out Wilhoite initially.[2]

In sum, while we do not foreclose the possibility that the District Court could find that Wilhoite's appointment was not racially motivated, we emphasize that on remand, the District Court must address the evidence of racial motivation, including the evidence that Sigholtz felt compelled to place a black person in the position and that he therefore sought out the clearly unqualified Wilhoite in order to convince her to apply.[3]

### B. *The Stadium Management Positions*

The District Court also discounted direct evidence that Sigholtz' decision not to promote Underwood to the position of stadium manager was the result of unlawful sex discrimination—Underwood's unrefuted testimony that Sigholtz told her that she had not been selected for that position because stadium management was "a man's job." The court reached the same conclusion as it had with respect to Underwood's claim of racial discrimination in her nonselection to the armory management positions: that Sigholtz was in fact motivated by the desire to keep Underwood as his "right hand" assistant. Accordingly, the court concluded that Sigholtz' sexist comment was "best understood as an excuse rather than the true reason for plaintiff's nonselection." 38 Fair Empl.Prac.Cas. at 1720.

■ There is considerable evidence in the record to support the District Court's determination that Sigholtz' motive for not appointing Underwood to the stadium management positions was one of self-protection rather than discrimination. Sigholtz freely admitted that he named Murphy rather than Underwood to the special assistant-acting stadium manager position

because Underwood "was like a right arm to me and I would hate like heck to lose her." Tr. at 354. Underwood was not even considered for the position because she was "far too busy" with her responsibilities as Sigholtz' assistant. Tr. at 353. These statements contrast sharply with Sigholtz' testimony concerning the selection of Wilhoite as the acting armory manager, in which he insisted that he appointed Wilhoite "because she was black." Tr. at 340. Moreover, there is evidence that Underwood was not as qualified as William Barnhill, who was selected for the position of stadium manager after Murphy resigned. Barnhill's credentials with respect to educational background and previous stadium management experience were clearly superior to those of Underwood. Although it is a close question, the District Court's conclusion that Sigholtz' decision to hire the admittedly highly qualified Barnhill for the stadium management position and to keep Underwood as his own "indispensable associate" was not based on sex cannot be said to be clearly erroneous.

■ The District Court properly rejected Underwood's claim of discrimination with respect to the position of stadium management assistant, which was never filled. *See Freeman v. Lewis*, 675 F.2d 398, 403 (D.C.Cir.1982) ("if *no one* was promoted ... during the time plaintiff says she should have been," plaintiff cannot make out prima facie case of discrimination). Because the stadium was "rapidly losing tenants as sports teams left the city," the court concluded that the Board's decision not to fill the stadium management assistant position was made for legitimate business reasons rather than as a result of discrimination. 38 Fair Empl.Prac.Cas. at 1720. This finding is supported by the

---

**2.** The fact that Wilhoite was recommended for the armory manager position by her supervisor, Kenneth Hopkins, also does not adequately explain the circumstances of Wilhoite's selection. Sigholtz testified that Hopkins' recommendation of Wilhoite "meant nothing" to him, Tr. at 412–13, and that he had not even received the recommendation until after he decided to appoint Wilhoite. Tr. at 409–10. In any event, it is clear that Wilhoite did not possess the required qualifications for the position. Tr. at 165–67.

**3.** Appellees have asserted no claim that the appointment of Wilhoite was part of an affirmative action plan; in fact, appellees deny that Wilhoite's race played any role in her selection. *See* Brief for Appellees at 24–26. Accordingly, the Supreme Court's recent decision in *Johnson v. Transportation Agency*, 473 U.S. ——, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987), has no bearing on our decision in this case.

evidence that the Board also decided not to hire anyone to fill the stadium manager position after Barnhill was dismissed, apparently concluding that a stadium with only one tenant could be adequately managed by the general manager without additional management personnel.

### C.  *The Retaliation Claims*

The District Court concluded that the Board's decisions to remove Underwood from her position as recording secretary, to conduct a desk audit of her duties, and subsequently to remove some of those duties were not motivated by "retaliatory animus." 38 Fair Empl.Prac.Cas. at 1721. This court has held that, once a plaintiff has made out a prima facie case of retaliation, the defendant "must articulate a legitimate, nondiscriminatory reason for the personnel action," after which the plaintiff may prevail by showing that the "proffered reason was but a pretext for retaliation." *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C.Cir.1984). Here, the District Court's finding that the actions taken by appellees were not motivated by a desire to retaliate against Underwood for filing this action was not clearly erroneous. Underwood's duties as recording secretary were only a minor adjunct to her regular position, and the Board could reasonably have feared that its discussion of personnel issues (and particularly its discussion of Underwood's lawsuit) would be inhibited by her presence. It is also clear that one result of Underwood's filing her discrimination claims was to bring to the Board's attention the fact that she had been performing duties far beyond those specified in her job description, and it was reasonable for the Board to seek to "delineate and consolidate the duties of [its] employees." 38 Fair Empl.Prac.Cas. at 1721.

### III.  Conclusion

Appellant's claim that her nonselection for the position of acting armory manager was the result of unlawful race discrimination is remanded to the District Court for further proceedings not inconsistent with this opinion. We affirm the judgment of the District Court with respect to appellant's other discrimination and retaliation claims.

*So Ordered.*