Ronald SHELTON, Plaintiff,

v.

Bruce BABBITT, Secretary, U.S. Department of Interior, Defendant.

Civil A. No. 92–1123 (HHG).

United States District Court, District of Columbia.

April 26, 1994.

Maxine Bethel Cade, Cade & Vaughn–Carrington, Washington, DC, for Ronald Shelton.

Edith Sophia Marshall, U.S. Attorney's Office, Washington, DC, for Manuel Lujan, Jr., Bruce Babbitt.

## OPINION

HAROLD H. GREENE, District Judge.

In this Title VII[1] case, the plaintiff contends that officials of the Bureau of Mines, an agency of the Department of the Interior, brought about an unwarranted 30–day suspension from his position and discouraged him in his employment relationships in various other ways, with the result that he finally resigned. This constructive discharge[2], plaintiff argues, occurred as a consequence of racial discrimination and reprisal.[3]

### I

The evidence adduced at the trial demonstrated the following. Ronald Shelton was a long-time employee of the Department of the Interior, who, at the time of the incidents in question in this case, was manager of the Bureau's Equal Opportunity Investigations Office. His performance appraisals had always been excellent or superior, and there was no blemish on his record. However, beginning in 1987, he was disadvantaged in various ways, and this discriminatory treatment culminated in 1989 in his suspension and other acts by the then relatively new criminatory practices on the part of the employer.

---

1. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*

2. The term "constructive discharge" encompasses a situation in which an employee terminates the employment relationship due to alleged dis-

3. Plaintiff also claimed age discrimination, but there was no evidence to support that claim.

Director of the Bureau of Mines, T.S. Ary,[4] and another high-level supervisor by the name of Larry Miller. None of the other division heads in the Bureau of Mines, all of whom were white, were similarly treated.

Among the relatively minor slights and disadvantages plaintiff endured during this period were the removal from his job description of his role as a liaison with the Annual Conference of Historically Black College and University Program (HBCU) which he had handled, at least in part, for a considerable period of time; his exclusion from management conferences attended by other division chiefs; and his exclusion from the presentation function at such conferences. Furthermore, Mr. Ary, the then new Director of the Bureau of Mines, gave plaintiff a lower appraisal rating than he had received on any evaluation until that date—one that would have hampered his progress within the Agency. Indeed, despite many efforts, and his incumbency in the position for many years, he was not promoted from his GS-14 grade to a GS-15. However, his successor in that position, a Hispanic woman, received that very promotion within a year.

The culmination of this discriminatory pattern occurred when plaintiff was suspended from his job in 1989. The circumstances of this suspension deserve more extended discussion. Ellie Gilbert, an employee in the EEO Office, was dispatched in March 1987 by plaintiff to conduct an investigation in the Bureau of Mines Research Center located in Tuscaloosa, Alabama. On four occasions, she travelled from Tuscaloosa to Pensacola, Florida, a city where she had relatives, in her government-leased car. These trips by Ms. Gilbert, and Mr. Shelton's approval, or at least his failure to disapprove, are at the heart of defendant's claims that these two EEO employees violated travel regulations.[5] However, as the testimony and the evidence adduced at trial made clear, the matters surrounding these trips are not nearly as clear-cut as the Bureau of Mines has attempted to make them appear.

As concerns the first of the detours by Ms. Gilbert from Tuscaloosa to her ultimate official destination, Salt Lake City, it was specifically approved by the Bureau's Finance Office, and for that reason could not reasonably be charged against her, or her supervisor Shelton, with any degree of legitimacy.

Ms. Gilbert's third and fourth trips involved similar detours and these detours were also approved by Mr. Shelton and/or the Finance Liaison Officer as being cost effective. Defendant's bureaucratic complaints seem designed to create a problem where before one did not exist.

It is the second trip away from Tuscaloosa to Pensacola that was apparently regarded by Mr. Ary, the Bureau Director, as the most serious, including as it did two work days for which Ms. Gilbert did not request annual leave. However, upon closer examination, the charges regarding that trip illuminate most clearly the anti-EEO, and inferentially, possibly an anti-black, bias that animated from Mr. Ary and others under his command.

When Ms. Gilbert arrived in Tuscaloosa for her EEO investigation, she was met with massive hostility by the Bureau's personnel at the Research Center. According to her testimony, Center personnel were eavesdropping at the door to the room where she was conducting her interviews; her telephone calls were being monitored; and she was awakened by loud nighttime noises against her motel room door. Her testimony regarding the extreme hostility and disdain was corroborated, albeit indirectly, first, by the fact that the manager of the Tuscaloosa facility, one Stanczyk, directly walked out of and never returned to a meeting at which Ms. Gilbert was seeking to collect EEO data, and second, by a letter signed by twenty-eight employees of the Center to a United

---

4. The final decision regarding Shelton's suspension was made by Mr. Doyle Frederick, at the time an Assistant Secretary in the Department of the Interior. However, that official had been at the Department for only a few weeks, and he relied on others for his decision, particularly Mr. Ary.

5. Ms. Gilbert also filed suit in this Court. A judgment was entered in favor of defendants. *See Gilbert v. Babbitt,* No. 92–1124, 1993 WL 468465 (D.D.C. Oct. 29, 1993)

States Senator, complaining that the EEO process was being abused to the detriment of the Center's employees and in effect asked him to get the Equal Employment representatives off their backs.

Two conclusions can be drawn from this unusual sequence of events. First, that Ms. Gilbert was justified in leaving Tuscaloosa to escape the massive hostility there and the perceived threat to her physical safety, and second, that Mr. Ary's reaction to these incidents—without any proof whatever, he cast doubt on Ms. Gilbert's recitation of events; he minimized their significance; and he suggested that she was wrong in what she did and that she should have taken alternative, absurd courses of action—indicates that hostility to EEO and concurrently to Ms. Gilbert and Mr. Shelton existed at the highest levels at the Bureau of Mines.[6]

To be sure, as the Bureau of Mines suggests, Ms. Gilbert could have escaped to a city closer to Tuscaloosa, such as Birmingham. However, it again shows singular lack of empathy with the Bureau's own EEO employees to regard her escape to her family from segregationist pressure by white opponents of EEO as a cause for discipline of both her and her supervisor.

In any event, Ms. Gilbert repaid the government for the amounts that may have been [7] improperly expended by the detour as soon as the matter was drawn to her attention. As for the Bureau's rationale that under its disciplinary procedures it had no choice but to impose at least a thirty day suspension on Shelton, a black male, it is directly contradicted by the fact that the actual "perpetrator," Ms. Gilbert—who is white—was penalized by only a fifteen day suspension. Likewise, allegations of misuse of a government vehicle by Martin Stanczyk, the Research Director and a white male, were given only cursory treatment, and he was subjected to no discipline.

The Court draws yet another conclusion from the Tuscaloosa events. The evidence, albeit circumstantial, suggests that the initial impetus for the investigation of plaintiff originated with the anti-EEO staff at Tuscaloosa. The anonymous complaint against Mr. Shelton and Ms. Gilbert was made while the latter was investigating EEO matters at Tuscaloosa. Further, someone within the Bureau of Mines organization itself appears to have submitted written material to support the complaint inasmuch as official documents, such as travel vouchers, were submitted with it.

Beyond that, there was testimony, albeit indirect, that several high-level managers in the Bureau boasted that they had finally been successful in "getting" Shelton who had been a thorn in their sides. One of plaintiff's witnesses testified that Jerry Vroman, a branch chief in the Bureau of Mines, told him that Shelton was too much in favor of affirmative action and a nuisance to management; that he should be cut down, and that "at last we got Mr. Shelton." Vroman denied the claim, but the Court finds that his credibility, as well as those of Ary and William Miller, were low. Similarly, Robert Redmond, the then current head of the EEO office at the Bureau of Land Management, testified that he was informed by David Bruce, the Inspector General's investigator, that they were out to "get" Shelton, as well as other blacks of high rank.[8] Bruce, too, denied that charge. Surely, in this day and age, no one would openly admit either to discrimination or to being a party to the discipline or removal of a black employee, particularly one connected with equal employment services, and thus an admission by Vroman could not have been expected. This evidence strongly suggests that the Tuscaloosa–Washington connection

6. The court finds no discriminatory animus by Doyle Frederick, an Assistant Secretary of the Interior, who had been in his position for only a few weeks when he was persuaded to endorse the discipline against Shelton. However, other high level employees, including one William L. Miller, shared Ary's attitudes.

7. The actual amount, estimated by the government at $700, is by no means established, even after an Inspector General investigation. For example, it is not clear on what basis (mileage, duration) the rental car company calculated its charges.

8. The Court found Mr. Redmond to be a calm individual with an appropriate witness demeanor, whose testimony was credible.

was far closer than the geography would indicate.

The Court is convinced, based on all the evidence, as well as the demeanor of the witnesses, that a concerted effort did exist at the Bureau to force out, or at least to discipline, Mr. Shelton.

The Bureau also justified the discipline imposed on Mr. Shelton, in part, on his allowing Ms. Gilbert to proceed directly from her home to the airport on the days when she was required to travel out of town, instead of first proceeding to the office and to the airport from there. Not only did Ms. Gilbert explain that this procedure was necessary because she had to transport voluminous exhibits and other materials to her out-of-town investigative stops, and that the procedure was approved by someone in the Department's travel office, but several of the government's own witnesses conceded, albeit after some considerable prodding, that the practice of proceeding directly to the airport was not unusual, particularly when the flight from Washington was departing in the morning or early afternoon. Similarly, the charges against Shelton were based, again in part, on the telephone calls Ms. Gilbert made from Tuscaloosa from a public telephone instead of the official phone which was being monitored by the opponents of EEO. The fact that these minor "transgressions" [9] were seriously being used as means for disciplining Shelton—when it was not even he but his subordinate who committed them [10]—supports the inference that there was an effort to "get" the plaintiff.[11] The events during this period evidently took its toll on Mr. Shelton as he finally resigned in 1990.

## II

Title VII of the Civil Rights Acts of 1964 provides, among other things, that it is an unlawful employment practice for an employer to discriminate against an employee on the basis of race, color, religion, sex, or national origin in the areas of hiring, discharging, compensating, or otherwise subjecting an employee to conditions or privileges of employment.[12]

 A party alleging racial discrimination has the burden of proving by a preponderance of the evidence a *prima facie* case of discrimination, although this burden is "not onerous." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). A *prima facie* case is established if the plaintiff shows that (1) he is a member of a protected class; (2) he was qualified for his position; (3) he was discharged [actually or constructively] from that position and (4) similarly situated employees were not discharged. *See Valentino v. United States Postal Serv.*, 674 F.2d 56, 67 n. 15 (D.C.Cir. 1982) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973)). The plaintiff must establish facts, which, if unexplained, support the inference that it is more likely than not that the challenged action was taken for discriminatory reasons. *Furnco Construc. Corp., v. Waters*, 438 U.S. 567, 575–76, 98 S.Ct. 2943, 2948–49, 57 L.Ed.2d 957 (1978). The Court finds that the evidence produced at trial establishes a *prima facie* case of racial discrimination by the Bureau generally and T.S. Ary and Larry Miller specifically.

 Once a *prima facie* case is established, the burden shifts to the defendant to "articulate some legitimate non-discriminatory reason" for the contested action. *Burdine, supra*, 450 U.S. at 253, 101 S.Ct. at 1093. The defendant must introduce evidence sufficient for the trier of fact to con-

---

**9.** Even Mr. Ary finally admitted that the "telephone" charge was unjustified.

**10.** The Bureau's theory was that, as a supervisor, he had the duty to be more vigilant than he was.

**11.** For what it may be worth, it appears that the Inspector General was, and may still be, investigating Ary's own violations of the travel regulations on a far larger scale than Ms. Gilbert, involving 40 trips made during a two-year period

but having filed documentation on only one. (It is claimed, possibly correctly, that at least up to now, his violations have not cost the government any money.) Ary's violations received considerable publicity, in the *Washington Post* and elsewhere. See Tom Kenworthy, *Audit Questions Interior Department Travel*, Wash. Post, Jan. 7, 1993, at A4.

**12.** 42 U.S.C. § 2000e–2.

clude that it was not motivated by discriminatory animus. *Id.* at 257, 101 S.Ct. at 1095. Because defendant has shown that, indeed, plaintiff did violate the travel rules and the 30–day suspension is among the disciplinary actions available, the defendant has met its burden of production.

■ Because the Department of Interior has countered Mr. Shelton's *prima facie* case, the burden shifts back to plaintiff to show that the reasons offered by the defendant are a pretext for discrimination. *Id.* at 253, 101 S.Ct. at 1093. A plaintiff may demonstrate pretext by either directly persuading the Court that a discriminatory reason motivated the employer or indirectly showing that the employer's proffered explanation is unworthy of credence. *See Parker v. HUD,* 891 F.2d 316, 321 (D.C.Cir.1989). Here, plaintiff has persuaded the Court that anti-black bias animated from Mr. Ary and others, including Mr. Miller, at the Bureau of Mines. Additionally, plaintiff, through testimony offered at trial, has indirectly shown that the Department's proffered explanation for the 30–day sentence and the other acts endured by plaintiff are unworthy of credence. The Court finds that, indeed, Mr. Shelton was a victim of racial discrimination.

■ Title VII's prohibition against discharging includes the situation where an employer, while not actually and formally discharging an employee, makes conditions of continued employment intolerable so as to result in a "constructive discharge". *See e.g., Bishopp v. District of Columbia,* 788 F.2d 781 (D.C.Cir.1986). This Circuit requires a finding that "the employer deliberately made working conditions intolerable and drove the employee into 'an involuntary quit'" *Id.* at 790 (citations omitted). Further, "in order to find constructive discharge in a case involving a claim of discrimination, a District Court must find not only intentional discrimination, but also 'aggravating factors.'" *Dashnaw v. Pena,* 12 F.3d 1112, 1115 (D.C.Cir.1994) (citing *Clark v. Marsh,* 665 F.2d 1168, 1172 n. 4 (D.C.Cir.1981); *see also Katradis v. Dav–El of Washington,* 846 F.2d 1482, 1485 (D.C.Cir. 1988); *Bishopp v. District of Columbia,* 788 F.2d 781, 789–90 (D.C.Cir.1986). The Court of Appeals in outlining the proper standard to use when determining whether an employee was constructively discharged relied on the standard outlined by the Fifth Circuit: "a finding of constructive discharge requires a determination that 'working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Clark, supra* at 1173 (quoting *Bourque v. Powell Electrical Manufacturing Company,* 617 F.2d 61 (5th Cir.1980) (other citations omitted).

■ Because the Court has found that Mr. Shelton was a victim of racial discrimination, the first element of constructive discharge, intentional discrimination, has been met. The Court finds that the second element of aggravating factors has also been met. For example, the facts that Mr. Shelton had, since the arrival of Mr. Ary to the Bureau, been discriminated against, the predictable humiliation and loss of prestige accompanying the removal from his job description of his role as a liaison with the HBCU, the immediate return of that role as part of his replacement's job description and her promotion within six months of her arrival to the level of GS–15, and his exclusion from both conferences attended by other division chiefs and the presentation function at those conferences constitute the "aggravating factors" required by *Clark. Clark, supra* at 1175–76. Because the two elements of constructive discharge have been met, the Court finds that defendant deliberately made Mr. Shelton's "working conditions intolerable and drove him into 'an involuntary quit.'" *Id.* at 1176 (quoting *Retail Store Employees Union Local 880 v. NLRB,* 419 F.2d 329, 332 (D.C.Cir.1969).

Title VII provides that when the Court finds in favor of the plaintiff, the plaintiff is entitled to injunctive relief, reinstatement, back pay and other equitable relief that the Court deems appropriate. 42 U.S.C. § 2000e–5(g). Additionally, the statute provides for reasonable attorney fees and expert fees for the prevailing party. 42 U.S.C. § 2000e–5(k). Here, plaintiff seeks injunctive and declaratory relief, backpay in the amount of $35,021.00, frontpay in the amount

of $450,000.00, retroactive employee benefits and reasonable attorney's fees.

While the Court, consistent with the above, will enter judgment in favor of plaintiff as the prevailing party in an order being issued contemporaneously herewith, the Court will refrain from determining damages until an accounting has been provided to the Court as outlined in the aforementioned order.